FILED ——— ENTERED
——— LODGED ——— RECEIVED

JAN 2 2 2010    LK

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
DEPUTY

1

2

3

4

5

6

7

8         UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON
9

10   FEDERAL HOME LOAN BANK OF          NO. **C10- 139** m̃𝒫
     SEATTLE, a bank created by federal law,
11
                                         **NOTICE OF REMOVAL**
12              Plaintiff,

13        vs.

14   BARCLAYS CAPITAL INC., a Connecticut
     corporation; BCAP LLC, a Delaware limited
15   liability company; and BARCLAYS BANK
     PLC, a public limited company registered in     
16   England and Wales,
                                         **10-CV-00139-CMP** & Exhibit A
17
                Defendants.
18

19
          PLEASE TAKE NOTICE that Defendants Barclays Capital Inc., BCAP LLC, and
20
     Barclays Bank PLC, (collectively, "the Barclays Defendants"),[1] pursuant to 28 U.S.C.
21
     § 1446(a), submit this Notice of Removal of this action from the Superior Court of
22
     Washington for King County, in which the action is pending, to the United States District
23
     Court for the Western District of Washington. In support, the Barclays Defendants state:
24

25

26

27   ────────────────

28      [1] The Barclays Defendants specially appear for the purposes of removal only and reserve all defenses, as to
     jurisdiction, service or otherwise, available in this action.

*Notice of Removal - Page 1*

HILLIS CLARK MARTIN &
PETERSON, P.S.
1221 Second Avenue, Suite 500
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

NO FSS.

1.      On December 23, 2009, Plaintiff Federal Home Loan Bank of Seattle ("FHLBS") filed a summons (the "Summons") and complaint (the "Complaint") against the Barclays Defendants, captioned *Federal Home Loan Bank of Seattle v. Barclays Capital, Inc., BCAP LLC, and Barclays Bank PLC*, No. 09-2-46320-4 SEA, in the Superior Court of Washington, King County, a state court within the Western District of Washington (the "State Court Action").

2.      On December 29, 2009, copies of the Summons, Complaint and related documents were first served on BCAP LLC through its registered agent for process in Wilmington, Delaware.  On December 31, 2009, copies of the Summons, Complaint and related documents were first served on Barclays Capital Inc. through its registered agent for process in New York, New York.  On January 18, 2010, copies of the Summons, Complaint and related documents were first served on Barclays Bank PLC in the United Kingdom pursuant to the Hague Convention.

3.      The Complaint alleges violations of the Washington State Securities Act, Rev. Code Wash. 21.20.005 *et seq.*, in connection with certain offerings of certificates backed by residential mortgage loans.

4.      No further proceedings have occurred in the State Court Action, and none of the Barclays Defendants has served or filed an answer or otherwise responded to the Complaint.

5.      Pursuant to 28 U.S.C. § 1446(a), a copy of the documents served on BCAP LLC is attached to this Notice as Exhibit A; a copy of the documents served on Barclays Capital Inc. is attached to this Notice as Exhibit B; and a copy of the documents served on Barclays Bank PLC is attached to this Notice as Exhibit C.  Exhibits A–C are all the process

*Notice of Removal - Page 2*

and pleadings received by the Barclays Defendants, and no hearings or other proceedings have taken place in the State Court Action.

**First Basis for Removal –**

**Federal Charter/Agency Jurisdiction**

6.      FHLBS is a federal home loan bank created by the Federal Home Loan Bank Act, 12 U.S.C. § 1421 *et seq.*  The Federal Home Loan Bank Act authorizes and requires the director of the Federal Housing Finance Agency to create a series of banking institutions whose mission is "to provide to their members and housing associates financial products and services, including but not limited to advances, that assist and enhance such members' and housing associates: (a) Financing of housing, including single-family and multi-family housing serving consumers at all income levels; and (b) Community lending."  12 C.F.R. § 940.2.

7.      Federal Home Loan Banks are agencies of the United States. *Fahey v. O'Melveny & Myers*, 200 F.2d 420, 444-47 (9th Cir. 1953).

8.      Pursuant to 12 U.S.C. § 1432(a), any federal home loan bank, including FHLBS, may "sue and be sued, complain and defend, in any court of competent jurisdiction, State or Federal."

9.      As a consequence, 12 U.S.C. § 1432(a) confers original jurisdiction on the federal courts over cases involving federal home loan banks. *See American Nat'l Red Cross v. S.G.*, 505 U.S. 247, 248 (1992); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust ex rel. Fed. Nat'l Mortgage Ass'n v. Raines*, 534 F.3d 779, 785 (D.C. Cir. 2008) (collecting cases).

*Notice of Removal - Page 3*

HILLIS CLARK MARTIN & PETERSON, P.S.
1221 Second Avenue, Suite 500
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

10.    This Court, therefore, has original subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1345 and 12 U.S.C. § 1432 in that the proceeding involves FHLBS, a federal home loan bank.

**Second Basis for Removal –**

**Jurisdiction Related to Bankruptcy**

11.    Loans underlying certain investments at issue in this case were originated by IndyMac Bank F.S.B. ("IndyMac").  (Compl. ¶¶ 19, 80)

12.    The IndyMac-originated loans were acquired by Barclays Bank PLC pursuant to an Amended Master Loan Purchase Agreement ("MLPA") with IndyMac.  The MLPA contains a contractual indemnity running from IndyMac to certain Barclays Defendants for, *inter alia*, breaches of certain representations and warranties regarding IndyMac and the mortgages sold pursuant to the MLPA.  *See* Master Loan Purchase Agreement dated as of January 1, 2008 § 14.01 (attached as <u>Exhibit D</u>).  IndyMac further entered into two Indemnification and Contribution Agreements with BCAP LLC and Barclays Bank PLC containing indemnity provisions similar to those in the MLPA.  *See* Indemnification and Contribution Agreement dated February 5, 2008, § 1(a) (attached as <u>Exhibit E</u>); Indemnification and Contribution Agreement dated April 1, 2008, § 1(a) (attached as <u>Exhibit F</u>).

13.    The Barclays Defendants have indemnification claims against IndyMac for any claims, losses, damages, penalties, fines, forfeitures, legal fees or expenses arising out of this action pursuant to the contractual indemnity in the MLPA and related documents.

14.    On July 11, 2008, the Federal Deposit Insurance Corporation was appointed receiver for IndyMac.  On July 31, 2008, IndyMac Bancorp, Inc., the parent holding company

*Notice of Removal - Page 4*

HILLIS CLARK MARTIN & PETERSON, P.S.
1221 Second Avenue, Suite 500
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

of IndyMac, filed a voluntary petition for relief under Title 11 of the United States Code in the United States Bankruptcy Court for the Central District of California, Case No. 08-21752-BB (the "IndyMac Bankruptcy").

15.    "A civil proceeding is 'related to' a title 11 case if 'the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy.'" *McGuire v. United States*, 550 F.3d 903, 913 (9th Cir. 2008) (citing *In re Fietz*, 852 F.2d 455, 457 (9th Cir. 1988)).

16.    This action is related to the IndyMac Bankruptcy because IndyMac owes an indemnity obligation to Barclays.  Under applicable Ninth Circuit law, an indemnity obligation of this type could affect the property of the debtor, and thus gives rise to "related to" jurisdiction under 28 U.S.C. § 1334(b).  *See In re Fietz*, 852 F.2d 455, 457 (9th Cir. 1988); *Pacific Life Ins. Co. v. J.P. Morgan Chase & Co.*, No. SA CV 03-813-GLT, 2003 U.S. Dist. LEXIS 14705, at *2-3 (C.D. Cal. July 1, 2003).

17.    This Court, therefore, has original subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1334(b) in that the proceeding is related to a case under Title 11 of the United States Code.

**Third Basis for Removal –**

**Diversity Jurisdiction**

18.    At the time the Complaint was filed, FHLBS maintained its principal place of business at 1501 4th Avenue, Seattle, Washington.  Upon information and belief, FHLBS has no other offices, and FHLBS's operations are localized within Washington State.

*Notice of Removal - Page 5*

HILLIS CLARK MARTIN &
PETERSON, P.S.
1221 Second Avenue, Suite 500
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

19.     An institution federally chartered as a "body corporate" of a particular state is deemed a citizen of that state for purposes of diversity. *See Iceland Seafood Corp.* v. *National Consumer Co-op. Bank*, 285 F. Supp. 2d 719, 723 (E.D. Va. 2003).

20.     The Federal Home Loan Bank Act provides that FHLBS "shall become, as of the date of the execution of its organization certificate, a body corporate." 12 U.S.C. § 1432(a).  FHLBS's organization certificate in turn provides that FHLBS was established in the State of Washington, with its original principal place of business in Spokane. *See* FHLBS Organization Certificate (dated Dec. 31, 1963) (attached as <u>Exhibit G</u>).[2]

21.     FHLBS, therefore, is deemed a citizen of Washington State for purposes of determining diversity of citizenship. *See Burton v. U.S. Olympic Comm.,* 574 F. Supp. 517, 519 (C.D. Cal. 1983); *Loyola Federal Savings Bank v. Fickling*, 58 F.3d 603, 606 (11th Cir. 1995).

22.     Defendant Barclays Bank PLC is a public limited company registered in England and Wales.  Defendant Barclays Bank PLC maintains its principal place of business at 1 Churchill Place, London E14 5HP, England.

23.     Defendant Barclays Capital Inc. is a corporation organized under the laws of Connecticut.  Defendant Barclays Capital Inc. maintains its principal place of business at 745 Seventh Avenue, New York, New York 10019.

---

[2] The original organization certificate of FHLBS provides that it "shall be established in the City of Spokane, State of Washington" and named "Federal Home Loan Bank of Spokane."  FHLBS has since had a name change and has become the Federal Home Loan Bank of Seattle.

*Notice of Removal - Page 6*

24.     Defendant BCAP LLC is a limited liability company organized under the laws of Delaware.  Defendant BCAP LLC maintains its principal place of business at 200 Park Avenue, New York, New York 10166.

25.     None of the Barclays Defendants is a citizen of the State of Washington.

26.     FHLBS seeks rescission of contracts with a face value of approximately $662 million.  The value of rescission of these contracts to FHLBS exceeds $75,000, exclusive of interest and costs.

27.     This Court, therefore, has original subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a)(1) in that the amount of controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

## Conclusion

28.     Because the United States courts have original jurisdiction over all cases involving FHLBS, the removal of this case is proper pursuant to 28 U.S.C. § 1441(a).

29.     Because this case is related to a pending case under Title 11 of the United States Code, the removal of this case is proper pursuant to 28 U.S.C. § 1452(a).

30.     Because FHLBS has diverse citizenship from each Defendant, and the matter in controversy exceeds $75,000, exclusive of interest and costs, the removal of this case is proper pursuant to 28 U.S.C. § 1441(a).

31.     The Barclays Defendants are filing this Notice of Removal within thirty (30) days of their receipt of the Summons and Complaint.  Removal therefore is timely pursuant to 28 U.S.C. § 1446(b).

32.     There are no other named defendants in this action.

*Notice of Removal - Page 7*

33.     A copy of this Notice of Removal will be filed with the Superior Court of

Washington, King County, and will be served on counsel for Plaintiff FHLBS.

34.     Pursuant to Federal Rule of Bankruptcy Procedure 9027(a)(1), this case is a

non-core proceeding, and the Barclays Defendants do not consent to entry of final orders or

judgment by a bankruptcy judge.

DATED this 22nd day of January, 2010.

HILLIS CLARK MARTIN & PETERSON, P.S.

By    s/ Louis D. Peterson
     Louis D. Peterson, WSBA #5776
     Brian C. Free, WSBA #35788
     1221 Second Avenue, Suite 500
     Seattle WA 98101-2925
     Telephone:  (206) 623-1745
     Facsimile:  (206) 623-7789
     Email:  ldp@hcmp.com; bcf@hcmp.com

OF COUNSEL
LATHAM & WATKINS LLP
     Joseph J. Frank
     Paul Serritella
     Latham & Watkins LLP
     885 Third Avenue
     New York, NY  10022-4834
     Telephone:  (212) 906-1200
     Facsimile:  (212) 751-4864
     Email: Joseph.Frank@lw.com;
     paul.serritella@lw.com

OF COUNSEL
LATHAM & WATKINS LLP
     Michele D. Johnson
     Latham & Watkins LLP
     650 Town Center Drive, 20th Fl
     Costa Mesa, CA 92626-1925
     Telephone:  (714) 540-1235
     Facsimile:  (714) 755-8290
     Email: michele.johnson@lw.com

Attorneys for Defendants
Barclays Capital Inc., BCAP LLC, and
Barclays Bank PLC

ND: 13000.004 4843-7681-0501v1

*Notice of Removal - Page 8*

# EXHIBIT A

1
2
3
4
5
6
7
8
9

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

10 | FEDERAL HOME LOAN BANK OF
SEATTLE, a bank created by federal law,

No. 09-2-46320-4 SEA

11 |     Plaintiff,

SUMMONS [60 DAY]

12 |     v.

13 | BARCLAYS CAPITAL, INC., a Connecticut
corporation; BCAP LLC, a Delaware limited
14 | liability company; and BARCLAYS BANK
PLC, a public limited company registered in
15 | England and Wales,

16 |     Defendants.

17
18
19

**TO THE DEFENDANTS:**  A lawsuit has been started against you in the above entitled

20 court by FEDERAL HOME LOAN BANK OF SEATTLE.  Plaintiff's claim is stated in the

written complaint, a copy of which is served upon you with this summons.

21
22

In order to defend against this lawsuit, you must respond to the complaint by stating

23 your defense in writing, and by serving a copy upon the person signing this summons

within 60 days after the service of this summons, excluding the day of service, or a default

24
25

judgment may be entered against you without notice.  A default judgment is one where

plaintiff is entitled to what he asks for because you have not responded.  If you serve a

26

SUMMONS [60 DAY] – Page 1

1  notice of appearance on the undersigned person, you are entitled to notice before a default

2  judgment may be entered.

3          You may demand that the plaintiff file this lawsuit with the court. If you do so, the

4  demand must be in writing and must be served upon the person signing this summons.

5  Within 14 days after you serve the demand, the plaintiff must file this lawsuit with the

6  court, or the service on you of this summons and complaint will be void.

7          If you wish to seek the advice of an attorney in this matter, you should do so

8  promptly so that your written response, if any, may be served on time.

9          This summons is issued pursuant to rule 4 of the Superior Court Civil Rules of the

10  State of Washington and Revised Code of Washington 4.28.180.

11          DATED:  December 23, 2009.

12                                      YARMUTH WILSDON CALFO PLLC

13

14          By: _____
                Richard C. Yarmuth, WSBA #4990
15              Matthew A. Carvalho, WSBA #31201

16              818 Stewart Street, Suite 1400
                Seattle, WA 98101
17              Telephone: 206.516.3800

18

19              GRAIS & ELLSWORTH LLP
                70 East 55th Street
20              New York, New York 10022
                (212) 755-0100
21              (212) 755-0052 (fax)

22

23

24

25

26  500.01 jl213503 12/23/09

SUMMONS [60 DAY] – Page 2

FILED

09 DEC 23 PM 2:13

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 09-2-46320-4 SEA

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

FEDERAL HOME LOAN BANK OF
SEATTLE, a bank created by federal law,

      Plaintiff,

      v.

BARCLAYS CAPITAL, INC., a Connecticut
corporation; BCAP LLC, a Delaware limited
liability company; and BARCLAYS BANK
PLC, a public limited company registered in
England and Wales,

      Defendants.

No.

COMPLAINT FOR RESCISSION

## I. SUMMARY OF THIS COMPLAINT

1.     This is an action under the Securities Act of Washington, RCW 21.20.005 *et seq.*, to rescind the purchase and sale of four certificates backed by residential mortgage loans, which the defendants sold the plaintiff for $232,438,000, $189,416,000, $140,000,000, and $100,000,000, respectively. When they offered and then sold these certificates to the plaintiff, the defendants made numerous statements to the plaintiff about the certificates and the credit quality of the mortgage loans that backed them. Many of those

COMPLAINT FOR RESCISSION – Page 1

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

statements were untrue. Moreover, the defendants omitted to state many material facts that were necessary in order to make their statements not misleading. For example, the defendants made untrue statements, or omitted important information, about such material facts as the percentage of equity that borrowers had in their homes (reflected in the loan-to-value ratio, or the ratio of the amount of the mortgage loan to the value of the house that secured the loan), the number of borrowers who actually lived in the houses that secured their loans, the credit scores of the borrowers, and the business practices of the lenders that made the loans. Plaintiff reasonably relied on these untrue statements and omissions of important information in deciding to purchase the certificates. Under the Act, plaintiff therefore is entitled to rescind its purchase of these certificates, and the defendants are required to repurchase the certificates from the plaintiff for their original purchase prices, plus interest at 8% per annum, plus the costs and legal fees that plaintiff will incur in this action, minus distributions that plaintiff has received on the certificates.

## II. PARTIES

2.    The plaintiff, Federal Home Loan Bank of Seattle (referred to in this complaint as Seattle Bank), is a bank created by the Federal Home Loan Bank Act. Under its Organization Certificate, Seattle Bank is to operate in Federal Home Loan Bank District Number 12, which comprises the States of Alaska, Hawaii, Idaho, Montana, Oregon, Utah, Washington, and Wyoming, as well as certain territories of the United States. Seattle Bank does operate throughout those States and territories.

3.    Defendant Barclays Capital Inc. (referred to as Barclays Capital) is a corporation organized under the laws of Connecticut.

COMPLAINT FOR RESCISSION – Page 2

4.      Defendant BCAP LLC (referred to as BCAP) is a limited liability company organized under the laws of Delaware.

5.      Defendant Barclays Bank PLC is a public limited company registered in England and Wales. Barclays Bank PLC maintains an office in New York.

6.      On information and belief, Barclays Bank PLC participated in the operations of BCAP and had the power to control the conduct of BCAP in the transactions involved in this complaint. Under RCW 21.20.430(3), Barclays Bank PLC directly or indirectly controlled BCAP and is therefore liable to Seattle Bank jointly and severally with and to the same extent as BCAP.

### III. JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction under RCW 2.08.010.

8.      This Court has personal jurisdiction over each of the defendants because each of them offered and sold the securities referred to in this complaint to Seattle Bank in King County. This Court also has personal jurisdiction over defendant Barclays Capital because it is licensed to do business in Washington and has consented to the personal jurisdiction of the Courts of Washington.

9.      Venue is proper in this Court pursuant to RCW 4.12.025 because one or more defendants transacts business in King County.

### IV. SECURITIZATION OF MORTGAGE LOANS

10.      The securities that the defendants sold Seattle Bank are so-called **asset-backed securities**, or **ABS**, created in a process known as **securitization**. Securitization begins with loans (for example, loans secured by mortgages on residential properties, credit card loans, etc.) on which the borrowers are to make payments, usually monthly. The entity

COMPLAINT FOR RESCISSION – Page 3

that makes the loans is known as the **originator** of the loans. The process by which the

originator decides whether to make particular loans is known as the **underwriting** of loans.

In the loan underwriting process, the originator applies various criteria to try to ensure that

the loan will be repaid. Until the loans are securitized, the borrowers on the loans make

their loan payments to the originator. Collectively, the payments on the loans are known as

the **cash flow** from the loans.

11.    In a securitization, a large number of loans, usually of a similar type, are

grouped into a **collateral pool**. The originator of those loans sells them (and, with them, the

right to receive the cash flow from them) to a **trust**. The trust pays the originator cash for

the loans. The trust raises the cash to pay for the loans by selling **bonds**, usually called

**certificates**, to investors such as Seattle Bank. Each certificate entitles its holder to an

agreed part of the cash flow from the loans in the collateral pool.

12.    Thus, schematically, there are six steps in a securitization.

1.    Investors pay money to the trust.

2.    The trust issues certificates to the investors.

3.    The trust pays money to the originator.

4.    The originator sells to the trust the loans in the collateral pool, including the right to receive the cash flow from those loans.

5.    The trust collects cash flow from payments on the loans in the collateral pool.

6.    The trust pays each certificateholder its agreed part of the cash flow that the trust receives from payments on loans in the collateral pool.

*

13.    A few other aspects of securitization may be useful in reading the allegations

of this complaint. Each securitization has a **sponsor**, the prime mover of the securitization.

Sometimes the sponsor is the originator or an affiliate. In originator-sponsored

COMPLAINT FOR RESCISSION – Page 4

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

securitizations, the collateral pool usually contains loans made by the originator that is sponsoring the securitization. Other times, the sponsor may be an investment bank, which purchases loans from one or more originators, aggregates them into a collateral pool, sells them to a trust, and securitizes them. The entity that transfers the loans in the collateral pool to the trust is known as the **depositor**.

14.    The obligor of the certificates in a securitization is the trust that purchases the loans in the collateral pool. Because a trust has no assets other than the loans that it purchased, it may not be able to satisfy the liabilities of an issuer of securities (the certificates). The law therefore considers the **issuer** of an asset-backed certificate to be not the trust that is the obligor on the certificate, but rather the depositor.

15.    Finally, certificates issued in securitizations are purchased from the trust and sold to investors by firms acting as **securities underwriters**.

\*

16.    When a traditional company issues common shares, bonds, or other securities, it and its underwriters must disclose material information about the business and management of the company to potential investors in those securities. In a securitization trust, however, there is no business or management to describe. Rather, the necessary disclosures are about the structure of the transaction and especially about the credit quality of the loans in the collateral pool, the sole source of cash from which to pay the certificateholders.

\*

17.    Defendants sold to Seattle Bank certificates in four securitizations.

COMPLAINT FOR RESCISSION – Page 5

III
YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

# V. FIRST CLAIM FOR RELIEF

|  |  |
|---|---|
| *Certificate*: | One certificate in tranche A-1 of BCAP LLC Trust, Mortgage-Backed Pass-Through Certificates, Series 2008-IND2 |
| *Date of Purchase*: | April 15, 2008 |
| *Consideration Paid*: | $232,438,000 |
| *Underwriter*: | Barclays Capital |
| *Depositor/Issuer*: | BCAP |
| *Controlling Person of Depositor/Issuer*: | Barclays Bank PLC |

18.     Seattle Bank repeats paragraphs 1 through 17.

19.     BCAP LLC Trust, Mortgage-Backed Pass-Through Certificates, Series 2008-IND2 was a securitization in April 2008 of approximately 692 mortgage loans, in one group, with an aggregate principal balance of approximately $332,055,713. The mortgage loans were originated or acquired by IndyMac Bank, F.S.B. The loans were "nonconforming," that is they did not conform to credit standards promulgated by Fannie Mae and Freddie Mac.[1]

20.     Barclays Capital and BCAP offered and sold to Seattle Bank a senior certificate in this securitization, in tranche A-1, for which Seattle Bank paid $232,438,000 on April 15, 2008.

21.     In connection with their offer and sale of this certificate to Seattle Bank, Barclays Capital and BCAP sent numerous documents to Seattle Bank at its office in King County. These documents included the prospectus supplement filed with the SEC for this

---

[1] Nonconforming loans include both "alt-A" and "subprime" loans, but there are no precise definitions of those terms.

COMPLAINT FOR RESCISSION – Page 6

YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

securitization,[2] drafts of some of the statistical tables to be included in the prospectus supplement, and a computer model of the financial structure of the securitization. In these documents, Barclays Capital and BCAP made statements of material fact about the certificate that they offered and sold to Seattle Bank.

22.     Seattle Bank relied on the statements by Barclays Capital and BCAP in these documents in deciding to purchase this certificate. It was reasonable for Seattle Bank to rely on the statements in these documents.

23.     Many of the statements of material fact that Barclays Capital and BCAP made in these documents were untrue or misleading. These untrue or misleading statements included the following.

**A.    Untrue or Misleading Statements about the Loan-to-Value Ratios (LTVs) and Combined Loan-to-Value Ratios (CLTVs) of the Mortgage Loans in the Collateral Pool of this Securitization**

**1.    The materiality of LTVs and CLTVs**

24.     The loan-to-value ratio of a mortgage loan, or LTV, is the ratio of the amount of the mortgage loan to the value of the mortgaged property when the loan is made. For example, a loan of $300,000 secured by property valued at $500,000 has an LTV of 60%; a loan of $450,000 on the same property has an LTV of 90%. LTV is one of the most important measures of the risk of a mortgage loan, and the LTVs of the mortgage loans in the collateral pool of a securitization are likewise one of the most important measures of the risk of certificates sold in that securitization. LTV predicts the likelihood of default (the lower the LTV, the less likely that a decline in the value of the property will wipe out the

---

[2] The prospectus supplement for BCAP 2008-IND2 was filed with the SEC and is available at http://www.sec.gov/Archives/edgar/data/1337454/000091412108000355/by12467391-424b5.txt.

COMPLAINT FOR RESCISSION – Page 7

owner's equity, and thereby give the owner an incentive to stop making mortgage payments and abandon the property). LTV also predicts the severity of loss in the event of default (the lower the LTV, the greater the "cushion," so the greater the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan).

25.     The denominator in LTV (value of the mortgaged property) is determined by either an appraisal or by the purchase price of the property. In a refinancing or home-equity loan, there is no purchase price to use as the denominator. For a purchase, the agreed price may be higher than the value of the property, and an appraisal should ensure that the LTV is calculated using the actual value as the denominator. Sometimes in a purchase, the denominator is the lower of the purchase price or the appraised value.

26.     Thus, an accurate appraisal is essential to an accurate LTV. In particular, a too-high appraisal will understate, sometimes greatly, the risk of a loan. To return to the example above, if the property whose actual value is $500,000 is appraised instead at $550,000, then the LTV of the $300,000 loan falls from 60% to 54.5%, and the LTV of the $450,000 loan falls from 90% to 81.8%. In either case, the LTV based on the incorrect appraisal understates the risk of the loan. It is also important to note that, the higher the correct LTV, the more the risk is understated by an incorrect appraisal of any given magnitude. In the example above, there is little difference in the risk of a loan with an LTV of 60% and one with an LTV of 54.5%; both are safe loans with large equity cushions. But there is a very large difference in the risk of a loan with an LTV of 90% and one with an LTV of 81.8%. In the latter case, there is an equity cushion of 18.2% of the value of the property, in the former, only 10%, just over half as much. Thus, an appraisal that

COMPLAINT FOR RESCISSION – Page 8

iḷi
YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

overvalues a property by just 10% produces an overstatement of more than 80% in the homeowner's equity.

27.     LTV is an important measure of the risk of a mortgage loan, and the LTVs of the mortgage loans in the collateral pool of a securitization are likewise an important measure of the risk of certificates sold in that securitization. LTV helps to predict both the likelihood of default and the severity of loss in case of default. A reasonable investor considers LTV important to the decision whether to purchase a certificate in a securitization of mortgage loans. Even small differences in the weighted average LTV of the mortgage loans in the collateral pool of a securitization have a significant effect on the risk of each certificate sold in that securitization, and thus, are important to the decision of a reasonable investor whether to purchase any such certificate.

\*

28.     Residential properties can secure more than one mortgage loan, a senior (or first) and one or more junior mortgage loans. The combined loan-to-value ratio (CLTV) is the ratio of the total outstanding principal balance of all loans (mortgages or home equity lines of credit) that the property secures to the appraised value of mortgaged property. To return to the example in paragraph 24, if a property valued at $500,000 secures a first mortgage loan of $300,000 and a second mortgage loan of $50,000, then it has a CLTV of 70%. If the first mortgage loan on the same property is $450,000 and the second is $50,000, then the CLTV is 100%.

29.     Like LTV, CLTV is an important measure of the risk of a mortgage loan, and the CLTVs of the mortgage loans in the collateral pool of a securitization are likewise an important measure of the risk of certificates sold in that securitization. CLTV helps to

COMPLAINT FOR RESCISSION – Page 9

YARMUTH  WILSDON  CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

predict both the likelihood of default and the severity of loss in case of default. A reasonable investor considers CLTV important to the decision whether to purchase a certificate in a securitization of mortgage loans. Even small differences in the weighted average CLTV of the mortgage loans in the collateral pool of a securitization have a significant effect on the risk of each certificate sold in that securitization, and thus, are important to the decision of a reasonable investor whether to purchase any such certificate.

      **2.**      **Untrue or misleading statements by Barclays Capital and BCAP about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization**

      30.      In the prospectus supplement and other documents they sent to Seattle Bank, Barclays Capital and BCAP made the following statements about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization.

      a.      "Approximately 14.91% of the mortgage loans had loan-to-value ratios greater than 80% at origination." BCAP 2008-IND2 Pros. Sup. S-35, S-39.

      b.      "The weighted average loan-to-value ratio at origination of the mortgage loans is approximately 72.31% and approximately 14.91% of the mortgage loans had loan-to-value ratios at origination exceeding 80.00%." BCAP 2008-IND2 Pros. Sup. S-42.

      c.      The weighted average original LTV of all of the mortgage loans in the collateral pool was 72.31%, the weighted average combined original LTV was 75.23%, and the weighted average effective LTV was 68.71%.[3] BCAP 2008-IND2 Pros. Sup., sched. A, tbl.1.

---

[3] For some mortgage loans, the borrower, or a relative of the borrower, pledged additional collateral, such as securities, to secure the mortgage loans. The effective Loan-to-Value Ratio is

COMPLAINT FOR RESCISSION – Page 10

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1

2        d.      In Schedule A of the prospectus supplement ("Mortgage Loan

3  Statistical Information"), Barclays Capital and BCAP presented tables of statistics about the

4  mortgage loans in the collateral pool. Each table focused on a certain characteristic of the

5  loans (for example, cut-off date outstanding principal balance) and divided the loans into

6  categories based on that characteristic (for example, loans with principal balances at the

7  cut-off date of $1 to $50,000, $50,001 to $100,000, $100,001 to $150,000, etc.). Each table

8  then presented various data about the loans in each category. Among these data were the

9  "Weighted Average Original LTV," the "Weighted Average Original Effective LTV," and

10  the "Weighted Average Combined Original LTV with [simultaneous second liens at

11  origination]" of the loans in each category. There were 31 such tables in Schedule A for all

12  loans in the collateral pool. In each table, the number of groups into which the loans are

13  divided ranged from one to 20. Thus, in Schedule A, Barclays Capital and BCAP made

14  hundreds of statements about the weighted average original LTVs, weighted average

15  original effective LTVs, and weighted average original CLTVs of the loans in the collateral

16  pool. BCAP 2008-IND2 Pros. Sup., sched. A.

17        31.      These statements were untrue or misleading because (i) the stated LTVs,

18  effective LTVs, and CLTVs of a significant number of those mortgage loans were lower

19  than the actual LTVs, effective LTVs, and CLTVs; (ii) Barclays Capital and BCAP omitted

20  to state that the appraisals of a significant number of the properties that secured the

21  mortgage loans in the collateral pool were biased upward, so that stated LTVs, effective

---

defined as a fraction, the numerator of which is the principal balance of the mortgage loan, less the
amount of additional collateral pledged to secure the loan, and the denominator of which is the
appraised value of the property. In this securitization additional collateral was pledged for properties
with LTVs greater than 80%.

COMPLAINT FOR RESCISSION – Page 11

LTVs, and CLTVs of those mortgage loans based on those appraisals were lower than the true LTVs, effective LTVs, and CLTVs of those mortgage loans; or (iii) the stated CLTVs did not reflect second mortgages on a significant number of the properties that secured the mortgage loans in the collateral pool.

32.     In the prospectus supplement, Barclays Capital and BCAP made the following statement about the appraisals of the properties that secured the mortgage loans in the collateral pool: "To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession [*sic*] Appraisal Practice." BCAP 2008-IND2 Pros. Sup. S-48.

33.     This statement was untrue or misleading because appraisals of a significant number of the properties that secured the mortgage loans originated by IndyMac Bank, F.S.B. did not conform to USPAP.

34.     By these untrue and misleading statements, Barclays Capital and BCAP materially understated the risk of the certificates issued by BCAP LLC Trust 2008-IND2 that they offered and sold to Seattle Bank.

**3.      Basis of the allegations above that these statements by Barclays Capital and BCAP about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization were untrue or misleading**

**a.      Upward bias in appraisals**

35.     As noted above, an accurate appraisal is essential to an accurate LTV and CLTV. During the time before this securitization, however, there was widespread upward bias in appraisals of properties that secured nonconforming mortgage loans and consequent understatement of the LTVs and CLTVs of those loans. The main instigators of this bias were mortgage brokers, real estate brokers, and loan officers who were not paid unless

COMPLAINT FOR RESCISSION – Page 12

1  loans closed and properties changed hands, and who thus had a strong incentive to

2  importune appraisers to appraise properties at values high enough to enable transactions to

3  close. (Furnishing an appraisal high enough to enable a transaction to close was known as

4  "hitting the bid." In a sale, this meant ensuring that the appraised value was equal to or

5  greater than the agreed price. In a refinancing or second mortgage, "hitting the bid" meant

6  ensuring that the appraised value was high enough to enable the proposed loan to comply

7  with the lender's requirements for LTV.)

8

9      36.    Brokers and loan officers importuned appraisers by threatening to withhold

10 future assignments if an appraiser did not "hit the bid" and sometimes by refusing to pay for

11 completed appraisals that did not "hit the bid."

12     37.    There is abundant evidence of upward bias in appraisals throughout the

13 mortgage loan industry before the date of this securitization. Starting in 2000 and

14 continuing until 2009, 11,000 appraisers signed a petition addressed to the Appraisal

15 Subcommittee of the Federal Financial Institutions Examination Council, an agency of the

16 United States Government whose "mission is to ensure that real estate appraisers, who

17 perform appraisals in real estate transactions that could expose the United States

18 government to financial loss, are sufficiently trained and tested to assure competency and

19 independent judgment according to uniform high professional standards and ethics." In the

20 petition, the 11,000 appraisers wrote:

21

22

23          We, the undersigned, represent a large number of licensed and
            certified real estate appraisers in the United States, who seek your
24          assistance in solving a problem facing us on a daily basis. Lenders
            (meaning any and all of the following: banks, savings and loans,
25          mortgage brokers, credit unions and loan officers in general; not to
            mention real estate agents) have individuals within their ranks, who, as a

26

COMPLAINT FOR RESCISSION – Page 13

normal course of business, apply pressure on appraisers to hit or exceed a predetermined value.

This pressure comes in many forms and includes the following:

- the withholding of business if we refuse to inflate values,

- the withholding of business if we refuse to guarantee a predetermined value,

- the withholding of business if we refuse to ignore deficiencies in the property,

- refusing to pay for an appraisal that does not give them what they want,

- black listing honest appraisers in order to use "rubber stamp" appraisers, etc.

We request that action be taken to hold the lenders responsible for this type of violation and provide for a penalty on any person or business who engages in the practice of pressuring appraisers to do dishonest appraisals that do not provide for independent judgment. We believe that this practice has adverse effects on our local and national economies and that the potential for great financial loss exists. We also believe that many individuals have been adversely affected by the purchase of homes which have been over-valued.

38.     The first-hand statements of the 11,000 appraisers are corroborated by a nationwide survey of 1,200 appraisers during the second half of 2006, which was conducted by October Research Corporation and reviewed by the statistical consulting service of a major state university. The margin of error in the survey was plus or minus 3.2%. The respondents were asked about their experiences over as much as five years before the date of the survey. The results of the 2006 survey confirmed and elaborated on the findings of a 2003 survey which had found that 55% of appraisers felt "uncomfortable pressure to overstate property values in greater than half of their appraisals."

39.     Specific findings of the survey included:

COMPLAINT FOR RESCISSION – Page 14

- "90% of respondent appraisers indicated that they felt pressure to restate/adjust/change property valuations."

- "71% of appraisers indicated that they felt uncomfortable pressure from mortgage brokers to overstate property valuations."

- "Real estate agents and brokers exerted similar pressure 56% of the time."

- "96% of respondents felt that appraisers in their market, when pressured to restate/adjust/change values, did modify property values."

- 75% of respondents stated that their business was negatively affected when they refused to change a valuation.

- 68% of respondents lost the client when they refused to restate/adjust/change an appraised value.

- 45% of respondents did not get paid for their appraisals when they refused to restate/adjust/change an appraised value.

40.    It is very probable that, because there was upward bias in appraisals throughout the mortgage loan industry during the time before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had upwardly biased appraisals.

### b.    Violations of Uniform Standards of Professional Appraisal Practice

41.    Appraisers and appraisals are governed by the Uniform Standards of Professional Appraisal Practice (USPAP), which is promulgated by the Appraisal Standards Board. The Preamble to USPAP states that its purpose "is to promote and maintain a high level of public trust in appraisal practice." USPAP includes the following provisions:

a.    Third USPAP Ethics Conduct Rule: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests."

COMPLAINT FOR RESCISSION – Page 15

        b.    Fifth USPAP Ethics Conduct Rule: "An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions."

        c.    Second USPAP Ethics Management Rule:

        It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

        1.    the reporting of a predetermined result (*e.g.*, opinion of value);

        2.    a direction in assignment results that favors the cause of the client;

        3.    the amount of a value opinion;

        4.    the attainment of a stipulated result; or

        5.    the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

    42.    The Appraisal Standards Board, which promulgates USPAP, also issues Advisory Opinions. Although the Advisory Opinions do not establish new standards or interpret USPAP, they "are issued to illustrate the applicability of appraisal standards in specific situations." Advisory Opinion 19 discusses "Unacceptable Assignment Conditions in Real Property Appraisal Assignments." As background, Advisory Opinion 19 notes that many appraisers report requests for their services accompanied by such conditions as: "Approximate (or Minimum) value needed: ____"; "If this property will not appraise for at least _____, stop and call us immediately"; etc. About such conditions, Advisory Opinion 19 states:

        Certain types of conditions are unacceptable in any assignment because performing an assignment under such conditions violates USPAP. Specifically, an assignment condition is unacceptable when it:

COMPLAINT FOR RESCISSION – Page 16

- precludes an appraiser's impartiality. Because such a condition destroys the objectivity and independence required for the development and communication of credible results;

- limits the scope of work to such a degree that the assignment results are not credible, given the intended use of the assignment; or

- limits the content of a report in a way that results in the report being misleading.

43.    Seattle Bank repeats paragraphs 35 through 39. This evidence demonstrates pervasive violations of USPAP throughout the nonconforming mortgage loan industry before the date of this securitization.

44.    It is very probable that, because there were widespread violations of USPAP throughout the mortgage loan industry during the time before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had appraisals conducted in violation of USPAP.

       **c.**     **Evidence of untrue or misleading statements about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization specifically**

45.    Since the date of this securitization, nine of the 692 mortgage loans in the collateral pool have been foreclosed upon. Those nine properties were sold for a total of approximately $2,617,152 in foreclosure. The total value ascribed to those same properties in the LTV and CLTV data reported in the prospectus supplement and other documents Barclays Capital and BCAP sent to Seattle Bank was $4,515,350. Thus, those properties were sold for 58.0% of the value ascribed to them, a difference of 42.0%. This large difference is evidence that the values ascribed to those properties, and to all properties in the collateral pool, in the LTV and CLTV data reported in the prospectus supplement and

COMPLAINT FOR RESCISSION – Page 17

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

other documents Barclays Capital and BCAP sent to Seattle Bank were too high, the resulting LTVs and CLTVs were too low, and thus that the statements in the prospectus supplement and other documents sent to Seattle Bank about the LTVs and CLTVs were untrue or misleading. The difference cannot be explained by the declines in house prices in the areas in which those properties were located (even after taking account of the fact that properties in foreclosure may sometimes sell for less than their fair market value). Analysis of data in an industry-standard database of securitized mortgage loans shows that the differences between the values ascribed to these properties and the prices at which the properties were sold in foreclosure are significantly greater than the declines in house prices in the same geographical areas over the same periods (that is, between the making of each mortgage loan and the corresponding foreclosure sale).

### d.   Undisclosed "silent second" mortgages

46.     During the time before this securitization, so-called "silent second" mortgages were pervasive in the nonconforming mortgage loan industry. A silent second is a second mortgage loan made by someone other than the first mortgage lender that is not disclosed to the first mortgage lender at the time of the first mortgage loan. (Often, a silent second was made by the seller of a property to enable the buyer to make the down payment required by the first mortgage lender.) Two economists at the Federal Reserve Bank of New York studied millions of noning first mortgage loans securitized starting in 2005 and found silent seconds on the properties that secured 25% or more of them.

47.     It is very probable that, because 25% or more of all securitized nonconforming first mortgage loans in the United States had silent seconds during the time

COMPLAINT FOR RESCISSION – Page 18

**ili**
YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had silent seconds.

**B.    Untrue or Misleading Statements about the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pool of this Securitization**

**1.    The materiality of occupancy status**

48.    Residential real estate is usually divided into primary residences, second homes, and investment properties. Mortgages on primary residences are less risky than mortgages on second homes and investment properties.

49.    Occupancy status (that is, whether the property that secures a mortgage is to be the primary residence of the borrower, a second home, or an investment property) is an important measure of the risk of a mortgage loan, and the percentage of loans in the collateral pool of a securitization that are secured by mortgages on primary residences rather than on second homes or investment properties is an important measure of the risk of certificates sold in that securitization. Other things being equal, the higher the percentage of loans secured by primary residences, the lower the risk of the certificates. A reasonable investor considers occupancy status important to the decision whether to purchase a certificate in a securitization of mortgage loans. Differences in the percentage of the mortgage loans in the collateral pool of a securitization that are secured by mortgages on primary residences have a significant effect on the risk of each certificate sold in that securitization and thus are important to the decision of a reasonable investor whether to purchase any such certificate.

COMPLAINT FOR RESCISSION – Page 19

**iii**

YARMUTH  WILSDON  CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

**2.**    **Untrue or misleading statements by Barclays Capital and BCAP about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization**

50.    In the prospectus supplement and other documents they sent to Seattle Bank, Barclays Capital and BCAP made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

a.    In Schedule A of the prospectus supplement described in paragraph 30, Barclays Capital and BCAP presented a table entitled "Occupancy." This table divided the loans in the collateral pool into the categories "Primary Home," "Investment," and "Secondary Home." For each category, the table stated the number of mortgage loans in that category and gave nine other items of information about them. BCAP 2008-IND2 Pros. Sup., sched. A, tbl.26.

b.    In the "Occupancy" table, Barclays Capital and BCAP stated that 89.15% of the mortgage loans in the collateral pool, by aggregate principal balance outstanding, were secured by a "Primary Home," 6.94% were secured by an "Investment" property, and 3.91% were secured by a "Secondary Home." BCAP 2008-IND2 Pros. Sup., sched. A, tbl.26.

51.    These statements were untrue or misleading because (i) the stated number of mortgage loans in the category "Primary Home" was higher than the actual number of loans in that category; (ii) the stated number of mortgage loans in the category "Investment" was lower than the actual number of loans in that category; (iii) the stated number of mortgage loans in the category "Secondary Home" was lower than the actual number of loans in that category; or (iv) Barclays Capital and BCAP omitted to state that the occupancy status of a

COMPLAINT FOR RESCISSION – Page 20

iii
YARMUTH  WILSDON  CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

significant number of the properties that secured the mortgage loans in the collateral pool was misstated because of fraud.

52.    By these untrue and misleading statements, Barclays Capital and BCAP materially understated the risk of the certificate issued by BCAP LLC Trust 2008-IND2 that they offered and sold to Seattle Bank.

**3.    Basis of the allegations above that these statements by Barclays Capital and BCAP about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization were untrue or misleading**

53.    Because they are less risky than other mortgage loans, mortgage loans on primary residences usually have more favorable terms, including lower interest rates, than mortgage loans on second homes and investment properties. Applicants for loans on second homes and investment properties therefore have an incentive to state that the property will be their primary residence even when it will not.

54.    This type of "occupancy fraud" was widespread throughout the nonconforming mortgage loan industry during the time before this securitization. BasePoint Analytics LLC, a consultant about fraud, studied millions of mortgage loans for evidence of fraud. BasePoint concluded that occupancy fraud comprised 20% of all mortgage fraud. In November 2007, Fitch conducted a detailed review of files on 45 subprime mortgage loans made in 2006 that had defaulted early in their terms. Fitch found that, in fully two-thirds of the loans, the borrowers had stated that the properties were to be owner-occupied, but in fact, they were not.

55.    It is very probable that, because there was widespread occupancy fraud throughout the nonconforming mortgage loan industry during the time before this

COMPLAINT FOR RESCISSION – Page 21

securitization, a significant number of the applicants for mortgage loans in the collateral pool of this securitization stated incorrectly that the properties that would secure the mortgage loans were to be their primary residences.

**C.    Misleading Statements about the FICO Scores of the Borrowers Whose Mortgage Loans Were in the Collateral Pool of this Securitization**

**1.    The materiality of FICO scores**

56.    A credit score (also called a FICO score after Fair Isaac Corporation, which devised the score) is a measure of a person's creditworthiness. The highest score is 850, the lowest 300. The score is calculated from such factors as the length of a person's credit history, the number of times a person has been late in paying bills, the amount of credit a person has available, etc. The higher a borrower's FICO score, the lower the risk that that borrower will default on payment of his or her mortgage.

57.    A borrower's FICO score is an important measure of the risk of a mortgage loan to that borrower, and the FICO scores of borrowers of the mortgage loans in the collateral pool of a securitization are likewise an important measure of the risk of certificates sold in that securitization. A reasonable investor considers FICO scores important to the decision whether to purchase a certificate in a securitization of mortgage loans. Differences in the weighted average FICO scores of borrowers of the mortgage loans in the collateral pool of a securitization have a significant effect on the risk of each certificate sold in that securitization and thus are important to the decision of a reasonable investor whether to purchase any such certificate.

COMPLAINT FOR RESCISSION – Page 22

1

      2.     **Misleading statements by Barclays Capital and BCAP about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization**

2

3        58.     In the prospectus supplement and other documents they sent to Seattle Bank,

4

Barclays Capital and BCAP made the following statements about the FICO scores of the

5

borrowers whose mortgage loans were in the collateral pool of this securitization.

6

         a.     The weighted average FICO score for all of the mortgage loans in the

7

collateral pool was 728. BCAP 2008-IND2 Pros. Sup., sched. A, tbl.1.

8

9         b.     In Schedule A of the prospectus supplement described in paragraph

10

30, Barclays Capital and BCAP presented 31 tables of statistics about the mortgage loans in

11

the collateral pool. In each table, the number of groups into which the loans are divided

12

ranged from one to 20. Among the data presented in each table was the "Non-Zero

13

Weighted Average FICO" of the loans in each category. Thus, in Schedule A, Barclays

14

Capital and BCAP made hundreds of statements about the weighted average FICO scores of

15

the loans in the collateral pool. BCAP 2008-IND2 Pros. Sup., sched. A.

16

17     59.     These statements were misleading because Barclays Capital and BCAP

18

omitted to state that a significant number of borrowers of the mortgage loans in the

19

collateral pool of this securitization inflated their FICO scores.

20

21     60.     By these misleading statements, Barclays Capital and BCAP materially

understated the risk of the certificate issued by BCAP LLC Trust 2008-IND2 that they

22

offered and sold to Seattle Bank.

23

24

25

26

COMPLAINT FOR RESCISSION – Page 23

ili
YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

3.    **Basis of the allegations above that these statements by Barclays Capital and BCAP about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization were misleading**

61.    A person's credit or FICO score is an important factor in his or her eligibility for a mortgage loan. In order to make themselves eligible for loans they would not otherwise be eligible for (or for larger loans than they would otherwise be eligible for), many borrowers used a practice known as "tradeline renting." As Fair Isaac itself described this practice in testimony to Congress, "customers with good FICO scores . . . add strangers with poor FICO scores to their credit card accounts as authorized users." (The strangers do not actually have the use of the account.) By this process, a person can raise his or her FICO score by as much as 75 points. By repeating the process, a person can raise his or her FICO score by as much as 200 points. Tradeline renting was available from "credit repair" sites on the Internet, which charged as much as $2,000 for the service. Tradeline renting was widespread throughout the nonconforming mortgage loan industry during the time before this securitization.

62.    In its review of subprime mortgage loans in November 2007, Fitch found that the FICO scores of 16% of the borrowers that it studied reflected tradeline renting.

63.    It is very probable that, because tradeline renting was widespread throughout the nonconforming mortgage loan industry during the time before this securitization, many of the borrowers of the mortgage loans in the collateral pool of this securitization raised their FICO scores by tradeline renting.

D.    **Failure to Disclose the Substantial Deterioration of LTV and FICO Score as Predictors of the Performance of Mortgage Loans Originated by IndyMac Bank, F.S.B.**

64.    Seattle Bank repeats paragraphs 24 through 63.

COMPLAINT FOR RESCISSION – Page 24

ili
YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

65.     Investors in mortgage-backed securities, including Seattle Bank, rely extensively on certain characteristics of the mortgage loans in the collateral pool of a securitization to predict the performance of those loans and thereby to determine the risk both of those loans and of the certificates sold in that securitization. Reasonable investors consider information about these characteristics important to the decision whether to purchase a certificate in a securitization of mortgage loans. Among the most important of these characteristics are LTV and FICO score.

66.     In the prospectus supplement and other documents they sent to Seattle Bank, Barclays Capital and BCAP made statements about the LTVs and FICO scores of the mortgage loans in the collateral pool, as summarized above. All of those statements are incorporated in this paragraph by reference.

67.     During the time before this securitization, the power of LTV and FICO score to predict the performance of otherwise similar nonconforming mortgage loans deteriorated, even after taking account of declines in house prices and other macroeconomic factors. Put somewhat differently, loans that were very similar in these characteristics performed worse if the loans were made in 2007 than if they were made in 2006, worse if made in 2006 than if made in 2005, etc.

68.     This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true in particular of nonconforming loans originated by IndyMac Bank, F.S.B., the originator of the mortgage loans in the collateral pool of this securitization. The lines in Figure 1 show, for all nonconforming loans originated by IndyMac Bank, F.S.B., that the weighted-average reported LTV and weighted-average reported FICO score were nearly constant. Despite the stability of these important credit

COMPLAINT FOR RESCISSION – Page 25

characteristics, however, the actual credit quality of nonconforming loans originated by

IndyMac Bank, F.S.B. deteriorated steadily during the time before this securitization. The

bars in Figure 1 show early payment defaults, that is, the percent of loans (by outstanding

principal balance) that became 60 or more days delinquent within six months after they

were made. An early payment default is usually the result of poor credit quality and poor

underwriting of the loan when it was made, rather than of macroeconomic factors after it

was made. As Figure 1 makes clear, the credit quality of the loans originated by IndyMac

Bank, F.S.B. deteriorated steadily from quarter to quarter from 2004 to 2007, even though

those loans had very similar reported LTVs and FICO scores.



Figure 1: Percent of Loans Originated by IndyMac Bank, F.S.B. 60+ Delinquent Six Months After Origination, by Quarter of Origination

69.    Figure 2 further illustrates the undisclosed deterioration in the credit quality

of nonconforming loans originated by IndyMac Bank, F.S.B., which had nearly constant

weighted-average reported LTVs and FICO scores. Figure 2 shows, for each month after

COMPLAINT FOR RESCISSION – Page 26

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

origination, the percentage (by outstanding principal balance) of nonconforming mortgage

loans originated by IndyMac Bank, F.S.B. in each of 2004, 2005, 2006, and 2007 that were

60 or more days delinquent. As Figure 2 makes clear, the credit quality of the loans

originated by IndyMac Bank, F.S.B. deteriorated steadily from 2004 to 2007, even though

those loans had very similar reported LTVs and FICO scores.



70.    All statements that Barclays Capital and BCAP made about the LTVs and

FICO scores of the mortgage loans in the collateral pool of this securitization were

misleading because those defendants omitted to state that, in the time before this

securitization, loans that were originated by IndyMac Bank, F.S.B. were nearly constant in

weighted average LTV and weighted average FICO score, yet performed worse if the loans

were made in 2007 than if they were made in 2006, worse if made in 2006 than if made in

2005, etc.

COMPLAINT FOR RESCISSION – Page 27

71.     By these misleading statements, Barclays Capital and BCAP materially understated the risk of the certificate issued by BCAP LLC Trust 2008-IND2 that they offered and sold to Seattle Bank.

**E.     Untrue or Misleading Statements about the Underwriting Guidelines of the Originator of the Mortgage Loans in the Collateral Pool of this Securitization**

**1.     The materiality of underwriting guidelines and the extent of compliance with them**

72.     Most or all originators of nonconforming mortgage loans had written guidelines by which they evaluated applications for loans. An originator's guidelines, and the extent to which the originator complies with them, are important indicators of the risk of mortgage loans made by that originator and of certificates sold in a securitization in which mortgage loans made by that originator are a substantial part of the collateral pool. A reasonable investor considers the underwriting guidelines of each originator of a substantial part of the mortgage loans in the collateral pool of a securitization, and the extent to which the originator complied with its guidelines, important to the decision whether to purchase a certificate in that securitization. Differences in those guidelines, or in the extent to which an originator complied with them, have a significant effect on the risk of each certificate sold in that securitization, and thus are important to the decision of a reasonable investor whether to purchase any such certificate.

**2.     Untrue or misleading statements by Barclays Capital and BCAP about the underwriting guidelines of the originator of the mortgage loans in the collateral pool of this securitization and about the extent of their compliance with those guidelines**

73.     On pages S-46 through S-49 of the prospectus supplement, Barclays Capital and BCAP made statements about the underwriting guidelines of IndyMac Bank, F.S.B.,

COMPLAINT FOR RESCISSION – Page 28

**ili**
YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

the originator of the mortgage loans in the collateral pool of this securitization. All of those statements are incorporated here by reference.

74.    One of these statements was that: "Exceptions to underwriting standards are permitted in situations in which compensating factors exist." BCAP 2008-IND2 Pros. Sup. S-49.

75.    On information and belief, these statements were untrue or misleading because Barclays Capital and BCAP omitted to state that: (a) IndyMac Bank, F.S.B. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines; (b) IndyMac Bank, F.S.B. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines when no compensating factor was present; and (c) IndyMac Bank, F.S.B. was failing frequently, and increasingly frequently, to follow quality-assurance practices intended to detect and prevent fraud.

76.    By these untrue or misleading statements, Barclays Capital and BCAP materially understated the risk of the certificate issued by BCAP LLC Trust 2008-IND2 that they offered and sold to Seattle Bank.

**3.    Basis of the allegations above that these statements by Barclays Capital and BCAP about the underwriting guidelines of the originator of the mortgage loans in the collateral pool of this securitization, and about the extent of their compliance with those guidelines, were untrue or misleading**

77.    During the time before this securitization, most or all originators of nonconforming mortgage loans relaxed their actual lending standards, notwithstanding their stated underwriting guidelines. Based on an empirical study of subprime loan applications, economists at the International Monetary Fund found "robust evidence that lending standards eased in the subprime mortgage industry during the fast expansion of the past few

COMPLAINT FOR RESCISSION – Page 29

years [i.e. 2005-2007]." This general relaxation of lending standards included: (a) frequent, and increasingly frequent, exceptions to stated underwriting guidelines; (b) frequent, and increasingly frequent, exceptions to underwriting guidelines when no compensating factor was present; (c) wholesale, rather than case-by-case, exceptions to underwriting guidelines; and (d) frequent, and increasingly frequent, failure to follow quality-assurance practices intended to detect and prevent fraud.

**F.    Claim for Rescission**

78.    Under RCW 21.20.010 and 21.20.430(1), Seattle Bank is entitled to recover the consideration that it paid for this certificate, $232,438,000, plus interest of 8% per annum from April 15, 2008, to the date on which it recovers the $232,438,000, plus its costs and the reasonable fees of its attorneys in this action, minus the amount of income it has received on the certificate. Pursuant to RCW 21.20.430(6), Seattle Bank will tender the certificate before entry of judgment.

## VI. SECOND CLAIM FOR RELIEF

| | |
|---:|:---|
| *Certificate*: | One certificate in tranche A-1 of BCAP LLC Trust, Mortgage-Backed Pass-Through Certificates, Series 2008-IND1 |
| *Date of Purchase*: | February 13, 2008 |
| *Consideration Paid*: | $189,416,000 |
| *Underwriter*: | Barclays Capital |
| *Depositor/Issuer*: | BCAP |
| *Controlling Person of Depositor/Issuer*: | Barclays Bank PLC |

79.    Seattle Bank repeats paragraphs 1 through 17.

COMPLAINT FOR RESCISSION – Page 30

Ш
YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

80.     BCAP LLC Trust, Mortgage-Backed Pass-Through Certificates, Series 2008-IND1 was a securitization in February 2008 of approximately 951 mortgage loans, in one group, with an aggregate principal balance of approximately $371,403,042. The mortgage loans were originated by IndyMac Bank, F.S.B. The loans were "nonconforming," that is they did not conform to credit standards promulgated by Fannie Mae and Freddie Mac.

81.     Barclays Capital and BCAP offered and sold to Seattle Bank a senior certificate in this securitization, in tranche A-1, for which Seattle Bank paid $189,416,000 on February 13, 2008.

82.     In connection with their offer and sale of this certificate to Seattle Bank, Barclays Capital and BCAP sent numerous documents to Seattle Bank at its office in King County. These documents included the prospectus supplement filed with the SEC for this securitization,[4] drafts of some of the statistical tables to be included in the prospectus supplement, and a computer model of the financial structure of the securitization. In these documents Barclays Capital and BCAP made statements of material fact about the certificate that they offered and sold to Seattle Bank.

83.     Seattle Bank relied on the statements by Barclays Capital and BCAP in these documents in deciding to purchase this certificate. It was reasonable for Seattle Bank to rely on the statements in these documents.

---

[4] The prospectus supplement for BCAP 2008-IND1 was filed with the SEC and is available at http://www.sec.gov/Archives/edgar/data/1337454/000091412108000120/by11906343-424b5.txt.

COMPLAINT FOR RESCISSION – Page 31

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

84.    Many of the statements of material fact that Barclays Capital and BCAP made in these documents were untrue or misleading. These untrue or misleading statements included the following.

**A.    Untrue or Misleading Statements about the Loan-to-Value Ratios (LTVs) and Combined Loan-to-Value Ratios (CLTVs) of the Mortgage Loans in the Collateral Pool of this Securitization**

**1.    The materiality of LTVs and CLTVs**

85.    Seattle Bank repeats paragraphs 24 through 29.

**2.    Untrue or misleading statements by Barclays Capital and BCAP about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization**

86.    In the prospectus supplement and other documents they sent to Seattle Bank, Barclays Capital and BCAP made the following statements about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization.

a.    "Approximately 4.91% of the mortgage loans had loan-to-value ratios greater than 80% at origination." BCAP 2008-IND1 Pros. Sup. 33, 38.

b.    "The weighted average loan-to-value ratio at origination of the mortgage loans is approximately 72.31% and approximately 4.91% of the mortgage loans had loan-to-value ratios at origination exceeding 80.00%." BCAP 2008-IND1 Pros. Sup. 41.

c.    The weighted average original LTV of the mortgage loans was 73.83%, the weighted average combined original LTV of the mortgage loans was 75.72%, the weighted average current LTV of the mortgage loans was 76.70%. BCAP 2008-IND1 Pros. Sup., sched. A, tbl.1.

COMPLAINT FOR RESCISSION – Page 32

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

d.       In Schedule A of the prospectus supplement ("Mortgage Loan Statistical Information"), Barclays Capital and BCAP presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, cutoff date outstanding principal balance) and divided the loans into categories based on that characteristic (for example, loans with principal balances as of the cutoff date of $1 to $50,000, $50,001 to $100,000, $100,001 to $150,000, etc.). Each table then presented various data about the loans in each category. Among these data were the "Weighted Average Original LTV" and the "Weighted Average Current LTV" of the loans in each category. There were 35 such tables in Schedule A for all loans in the collateral pool. In each table, the number of groups into which the loans are divided ranged from one to 40. Thus, Schedule A, Barclays Capital and BCAP made hundreds of statements about the weighted average original LTVs and the weighted average current LTVs of the loans in the collateral pool. BCAP 2008-IND1 Pros. Sup., sched. A.

87.       These statements were untrue or misleading because (i) the stated LTVs and CLTVs of a significant number of those mortgage loans were lower than the actual LTVs and CLTVs; (ii) Barclays Capital and BCAP omitted to state that the appraisals of a significant number of the properties that secured the mortgage loans in the collateral pool were biased upward, so that stated LTVs and CLTVs of those mortgage loans based on those appraisals were lower than the true LTVs and CLTVs of those mortgage loans; or (iii) the stated CLTVs did not reflect second mortgages on a significant number of the properties that secured the mortgage loans in the collateral pool.

88.       In the prospectus supplement, Barclays Capital and BCAP made the following statement about the appraisals of the properties that secured the mortgage loans in

COMPLAINT FOR RESCISSION – Page 33

the collateral pool: "To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession [*sic*] Appraisal Practice." BCAP 2008-IND1 Pros. Sup. 47.

89.     This statement was untrue or misleading because appraisals of a significant number of the properties that secured the mortgage loans originated by IndyMac Bank, F.S.B. did not conform to USPAP.

90.     By these untrue and misleading statements, Barclays Capital and BCAP materially understated the risk of the certificate issued by BCAP LLC Trust 2008-IND1 that they offered and sold to Seattle Bank.

3.     **Basis of the allegations above that these statements by Barclays Capital and BCAP about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization were untrue or misleading**

a.     **Upward bias in appraisals**

91.     Seattle Bank repeats paragraphs 35 through 39.

92.     It is very probable that, because there was upward bias in appraisals throughout the mortgage loan industry during the time before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had upwardly biased appraisals.

b.     **Violations of Uniform Standards of Professional Appraisal Practice**

93.     Seattle Bank repeats paragraphs 41 through 43.

94.     It is very probable that, because there were widespread violations of USPAP throughout the mortgage loan industry during the time before this securitization, a

COMPLAINT FOR RESCISSION – Page 34

iHi
YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

significant number of mortgage loans in the collateral pool of this securitization had

appraisals conducted in violation of USPAP.

### c. Evidence of untrue or misleading statements about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization specifically

95.     Since the date of this securitization, 48 of the 951 mortgage loans in the

collateral pool have been foreclosed upon. Those 48 properties were sold for a total of

approximately $15,453,741 in foreclosure. The total value ascribed to those same properties

in the LTV and CLTV data reported in the prospectus supplement and other documents

Barclays Capital and BCAP sent to Seattle Bank was $26,582,934. Thus, those properties

were sold for 58.1% of the value ascribed to them, a difference of 41.9%. This large

difference is evidence that the values ascribed to those properties, and to all properties in

the collateral pool, in the LTV and CLTV data reported in the prospectus supplement and

other documents Barclays Capital and BCAP sent to Seattle Bank were too high, the

resulting LTVs and CLTVs were too low, and thus that the statements in the prospectus

supplement and other documents sent to Seattle Bank about the LTVs and CLTVs were

untrue or misleading. The difference cannot be explained by the declines in house prices in

the areas in which those properties were located (even after taking account of the fact that

properties in foreclosure may sometimes sell for less than their fair market value). Analysis

of data in an industry-standard database of securitized mortgage loans shows that the

differences between the values ascribed to these properties and the prices at which the

properties were sold in foreclosure are significantly greater than the declines in house prices

in the same geographical areas over the same periods (that is, between the making of each

mortgage loan and the corresponding foreclosure sale).

COMPLAINT FOR RESCISSION – Page 35

1

    d.    Undisclosed "silent second" mortgages

2    96.    Seattle Bank repeats paragraph 46.

3    97.    It is very probable that, because 25% or more of all securitized

4
nonconforming first mortgage loans in the United States had silent seconds during the time

5
before this securitization, a significant number of mortgage loans in the collateral pool of

6
7    this securitization had silent seconds.

8    B.    Untrue or Misleading Statements about the Occupancy Status of the Properties
         That Secured the Mortgage Loans in the Collateral Pool of this Securitization

9
10    1.    The materiality of occupancy status

11    98.    Seattle Bank repeats paragraphs 48 through 49.

12    2.    Untrue or misleading statements by Barclays Capital and BCAP about
         the occupancy status of the properties that secured the mortgage loans
13         in the collateral pool of this securitization

14    99.    In the prospectus supplement and other documents they sent to Seattle Bank,

15
Barclays Capital and BCAP made the following statements about the occupancy status of

16
the properties that secured the mortgage loans in the collateral pool of this securitization.

17
18    a.    In Schedule A of the prospectus supplement described in paragraph

19
86, Barclays Capital and BCAP presented a table entitled "Occupancy." This table divided

20    the loans in the collateral pool into the categories "Primary," "Investment," and "Second

21    Home." For each category, the table stated the number of mortgage loans in that category

22    and gave nine other items of information about them. BCAP 2008-IND1 Pros. Sup., sched.

23    A, at 11.

24    b.    In the "Occupancy" table, Barclays Capital and BCAP stated that

25
86.25% of the mortgage loans in the collateral pool, by aggregate principal balance

26

COMPLAINT FOR RESCISSION – Page 36

outstanding, were secured by a "Primary" residence, 8.95% were secured by an

"Investment" property, and 4.81% were secured by a "Second Home." BCAP 2008-IND1

Pros. Sup., sched. A, at 11.

100.    These statements were untrue or misleading because (i) the stated number of

mortgage loans in the category "Primary" was higher than the actual number of loans in that

category; (ii) the stated number of mortgage loans in the category "Investment" was lower

than the actual number of loans in that category; (iii) the stated number of mortgage loans

in the category "Second Home" was lower than the actual number of loans in that category;

or (iv) Barclays Capital and BCAP omitted to state that the occupancy status of a significant

number of the properties that secured the mortgage loans in the collateral pool was

misstated because of fraud.

101.    By these untrue and misleading statements, Barclays Capital and BCAP

materially understated the risk of the certificate issued by BCAP LLC Trust 2008-IND1 that

they offered and sold to Seattle Bank.

**3.      Basis of the allegations above that these statements by Barclays Capital
and BCAP about the occupancy status of the properties that secured the
mortgage loans in the collateral pool of this securitization were untrue
or misleading**

102.    Seattle Bank repeats paragraphs 53 through 54.

103.    It is very probable that, because there was widespread occupancy fraud

throughout the nonconforming mortgage loan industry during the time before this

securitization, a significant number of the applicants for mortgage loans in the collateral

pool of this securitization stated incorrectly that the properties that would secure the

mortgage loans were to be their primary residences.

COMPLAINT FOR RESCISSION – Page 37

**C.    Misleading Statements about the FICO Scores of the Borrowers Whose Mortgage Loans Were in the Collateral Pool of this Securitization**

    **1.    The materiality of FICO scores**

    104.    Seattle Bank repeats paragraphs 56 through 57.

    **2.    Misleading statements by Barclays Capital and BCAP about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization**

    105.    In the prospectus supplement and other documents they sent to Seattle Bank, Barclays Capital and BCAP made the following statements about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization.

        a.    The non-zero weighted average FICO score of the borrowers of all of the mortgage loans in the collateral pool was 718. BCAP 2008-IND1 Pros. Sup., sched. A, at 1.

        b.    In Schedule A of the prospectus supplement described in paragraph 86, Barclays Capital and BCAP presented 35 tables of statistics about the mortgage loans in the collateral pool. In each table, the number of categories into which the loans are divided ranged from one to 40. Among the data presented in each table was the "Non-Zero Weighted Average FICO" of the loans in each category. Thus, in Schedule A, Barclays Capital and BCAP made hundreds of statements about the weighted average FICO scores of the loans in the collateral pool. BCAP 2008-IND1 Pros. Sup., sched. A.

    106.    These statements were misleading because Barclays Capital and BCAP omitted to state that a significant number of borrowers of the mortgage loans in the collateral pool of this securitization inflated their FICO scores.

COMPLAINT FOR RESCISSION – Page 38

107.    By these misleading statements, Barclays Capital and BCAP materially understated the risk of the certificate issued by BCAP LLC Trust 2008-IND1 that they offered and sold to Seattle Bank.

**3.    Basis of the allegations above that these statements by Barclays Capital and BCAP about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization were misleading**

108.    Seattle Bank repeats paragraphs 61 through 62.

109.    It is very probable that, because tradeline renting was widespread throughout the nonconforming mortgage loan industry during the time before this securitization, many of the borrowers of the mortgage loans in the collateral pool of this securitization raised their FICO scores by tradeline renting.

**D.    Untrue or Misleading Statements about the Debt-To-Income Ratios (DTIs) of the Borrowers Whose Mortgage Loans Were in the Collateral Pool of this Securitization**

**1.    The materiality of DTIs**

110.    DTI (also called debt service coverage ratio, or DSCR) is the ratio of certain of a borrower's monthly payments to his or her gross monthly income. The higher a borrower's DTI, the greater the risk that that borrower will default on payment of his or her mortgage.

111.    A borrower's DTI is an important measure of the risk of a mortgage loan to that borrower, and the DTIs of borrowers of the mortgage loans in the collateral pool of a securitization are likewise an important measure of the risk of bonds sold in that securitization. A reasonable investor considers DTIs important to the decision whether to purchase a bond in a securitization of mortgage loans. Differences in the weighted average DTIs of borrowers of the mortgage loans in the collateral pool of a securitization have a

COMPLAINT FOR RESCISSION – Page 39

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1    significant effect on the risk of each bond sold in that securitization and thus are important

2    to the decision of a reasonable investor whether to purchase any such bond.

3

4    **2.    Untrue or misleading statements by Barclays Capital and BCAP about**
         **the DTIs of the borrowers whose mortgage loans were in the collateral**

5         **pool of this securitization**

6    112.    In the prospectus supplement and other documents they sent to Seattle Bank,

7    Barclays Capital and BCAP made the following statements about the DTIs of the borrowers

8    whose mortgage loans were in the collateral pool of this securitization.

9         a.    In Schedule A of the prospectus supplement described in paragraph

10   86, Barclays Capital and BCAP presented 35 tables of statistics about the mortgage loans in

11   the collateral pool. In each table, the number of categories into which the loans are divided

12   ranged from one to 40. Among the data presented in each table was the "Non-Zero

13   Weighted Average DTI" of the loans in each group. Thus, in Schedule A, Barclays Capital

14   and BCAP made hundreds of statements about the weighted average DTIs of the loans in

15   the collateral pool. BCAP 2008-IND1 Pros. Sup., sched. A.

16   113.    These statements were untrue or misleading because (i) the stated DTIs were

17   lower than the actual DTIs or (ii) Barclays Capital and BCAP omitted to state that the DTIs

18   of a significant number of borrowers were understated because of fraud.

19   114.    By these misleading statements, Barclays Capital and BCAP materially

20   understated the risk of the certificate issued by BCAP LLC Trust 2008-IND1 that they

21   offered and sold to Seattle Bank.

22

23

24

25

26

COMPLAINT FOR RESCISSION – Page 40

ı̈ı̈ı̈

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

### 3. Basis of the allegations above that these statements by Barclays Capital and BCAP about the DTIs of the borrowers whose mortgage loans were in the collateral pool of this securitization were untrue or misleading

115.    A person's DTI is an important factor in his or her eligibility for a mortgage loan. In order to make themselves eligible for loans they would not otherwise be eligible for (or for larger loans than they would otherwise be eligible for), many borrowers overstated their gross monthly incomes to reduce their DTIs. In addition, many brokers and loan officers overstated the gross monthly incomes of prospective borrowers on their loan applications, often without the knowledge of the prospective borrower. Such practices were especially common in applications for so-called "stated income" loans, which did not require borrowers to prove their income.

116.    During the time before this securitization, overstatement of income and the resulting understatement of DTI were widespread. One study of 100 stated income loans compared the incomes that prospective borrowers stated on their loan applications with the incomes they reported to the IRS. The study found that 90% of the stated incomes were exaggerated by at least 5%, and almost 60% of the stated incomes were exaggerated by at least 50%. In its review of subprime mortgage loans in November 2007, Fitch found that, in nearly half, the income stated on the application for the loan was outside the reasonable range of income for the job the borrower said that he or she had. A study of three million historical loan applications by BasePoint Analytics concluded that 9% of loan performance problems could be attributed to fraud, and that "employment, income and occupancy fraud represented about 80% of identified fraud." BasePoint concluded that income fraud in particular accounted for as much as 50% of fraud. In some cases BasePoint found incomes inflated by as much as 500%. BasePoint also conducted a study of 128 subprime loan files

COMPLAINT FOR RESCISSION – Page 41

where the borrower, based on FICO score, might have qualified for a prime loan. In 35% of those loan files BasePoint found that the borrowers' incomes were "grossly overstated[,] [t]ypically by 100% or more."

117.    It is very probable that, because overstatement of income and resulting understatement of DTI were widespread in the nonconforming mortgage loan industry during the time before this securitization, the incomes of many of the borrowers of the mortgage loans in the collateral pool of this securitization were overstated on their applications for the loans. As a result, the reported DTIs of these borrowers were lower than the actual DTIs.

**E.    Failure to Disclose the Substantial Deterioration of LTV and FICO Score as Predictors of the Performance of Mortgage Loans Originated by IndyMac Bank, F.S.B.**

118.    Seattle Bank repeats paragraphs 85 through 117.

119.    Seattle Bank repeats paragraph 65.

120.    In the prospectus supplement and other documents they sent to Seattle Bank, Barclays Capital and BCAP made statements about the LTVs and FICO scores of the mortgage loans in the collateral pool, as summarized above. All of those statements are incorporated in this paragraph by reference.

121.    During the time before this securitization, the power of LTV and FICO score to predict the performance of otherwise similar nonconforming mortgage loans deteriorated, even after taking account of declines in house prices and other macroeconomic factors. Put somewhat differently, loans that were very similar in these characteristics performed worse if the loans were made in 2007 than if they were made in 2006, worse if made in 2006 than if made in 2005, etc.

COMPLAINT FOR RESCISSION – Page 42

ili
YARMUTH  WILSDON  CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

122.    This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true in particular of nonconforming loans originated by IndyMac Bank, F.S.B., the originator of the mortgage loans in the collateral pool of this securitization. As Figure 1 in paragraph 68 makes clear, the credit quality of the loans originated by IndyMac Bank, F.S.B. deteriorated steadily from quarter to quarter from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores. As Figure 2 in paragraph 69 makes clear, the credit quality of the loans originated by IndyMac Bank, F.S.B. deteriorated steadily from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.

123.    All statements that Barclays Capital and BCAP made about the LTVs and FICO scores of the mortgage loans in the collateral pool of this securitization were misleading because those defendants omitted to state that, in the time before this securitization, loans that IndyMac Bank, F.S.B. originated were nearly constant in weighted average LTV and weighted average credit score, yet performed worse if the loans were made in 2007 than if they were made in 2006, worse if made in 2006 than if made in 2005, etc.

124.    By these misleading statements, Barclays Capital and BCAP materially understated the risk of the certificate issued by BCAP LLC Trust 2008-IND1 that they offered and sold to Seattle Bank.

COMPLAINT FOR RESCISSION – Page 43

**F.    Untrue or Misleading Statements about the Underwriting Guidelines of the Originator of the Mortgage Loans in the Collateral Pool of this Securitization**

>   **1.    The materiality of underwriting guidelines and the extent of compliance with them**

125.    Seattle Bank repeats paragraph 72.

>   **2.    Untrue or misleading statements by Barclays Capital and BCAP about the underwriting guidelines of the originator of the mortgage loans in the collateral pool of this securitization and about the extent of their compliance with those guidelines**

126.    On pages 45 through 48 of the prospectus supplement, Barclays Capital and BCAP made statements about the underwriting guidelines of IndyMac Bank, F.S.B., the originator of the mortgage loans in the collateral pool of this securitization. All of those statements are incorporated here by reference.

127.    One of these statements was that: "Exceptions to underwriting standards are permitted in situations in which compensating factors exist." BCAP 2008-IND1 Pros. Sup. 48.

128.    On information and belief, these statements were untrue or misleading because Barclays Capital and BCAP omitted to state that: (a) IndyMac Bank, F.S.B. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines; (b) IndyMac Bank, F.S.B. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines when no compensating factor was present; and (c) IndyMac Bank, F.S.B. was failing frequently, and increasingly frequently, to follow quality-assurance practices intended to detect and prevent fraud.

COMPLAINT FOR RESCISSION – Page 44

ılı

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

129.    By these untrue or misleading statements, Barclays Capital and BCAP

materially understated the risk of the certificate issued by BCAP LLC Trust 2008-IND1 that

they offered and sold to Seattle Bank.

**3.    Basis of the allegations above that these statements by Barclays Capital and BCAP about the underwriting guidelines of the originator of the mortgage loans in the collateral pool of this securitization, and about the extent of their compliance with those guidelines, were untrue or misleading**

130.    Seattle Bank repeats paragraph 77.

**G.    Claim for Rescission**

131.    Under RCW 21.20.010 and 21.20.430(1), Seattle Bank is entitled to recover

the consideration that it paid for this certificate, $189,416,000, plus interest of 8% per

annum from February 13, 2008, to the date on which it recovers the $189,416,000, plus its

costs and the reasonable fees of its attorneys in this action, minus the amount of income it

has received on the certificate. Pursuant to RCW 21.20.430(6), Seattle Bank will tender the

certificate before entry of judgment.

### VII. THIRD CLAIM FOR RELIEF

| | |
|---|---|
| *Certificate*: | One certificate in tranche A-1 of BCAP LLC Trust Mortgage-Backed Pass-Through Certificates, Series 2007-AA5 |
| *Date of Purchase*: | September 21, 2007 |
| *Consideration Paid*: | $140,000,000 |
| *Underwriter*: | Barclays Capital |
| *Depositor/Issuer*: | BCAP |
| *Controlling Person of Depositor/Issuer*: | Barclays Bank PLC |

132.    Seattle Bank repeats paragraphs 1 through 17.

COMPLAINT FOR RESCISSION – Page 45

**Ill**
YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

1  133.    BCAP LLC Trust, Mortgage-Backed Pass-Through Certificates, Series

2  2007-AA5 was a securitization in September 2007 of approximately 324 mortgage loans, in

3  one group, with an aggregate principal balance of approximately $278,342,242. The

4  mortgage loans were originated by Countrywide Home Loans, Inc. The loans were

5  "nonconforming," that is they did not conform to credit standards promulgated by Fannie

6  Mae and Freddie Mac.

7  134.    Barclays Capital and BCAP offered and sold to Seattle Bank a senior

8  certificate in this securitization, in tranche A-1, for which Seattle Bank paid $140,000,000

9  on September 21, 2007.

10  135.    In connection with their offer and sale of this certificate to Seattle Bank,

11  Barclays Capital and BCAP sent numerous documents to Seattle Bank at its office in King

12  County. These documents included the prospectus supplement filed with the SEC for this

13  securitization,[5] drafts of some of the statistical tables to be included in the prospectus

14  supplement, and a computer model of the financial structure of the securitization. In these

15  documents Barclays Capital and BCAP made statements of material fact about the

16  certificate that they offered and sold to Seattle Bank.

17  136.    Seattle Bank relied on the statements by Barclays Capital and BCAP in these

18  documents in deciding to purchase this certificate. It was reasonable for Seattle Bank to rely

19  on the statements in these documents.

_____

[5] The prospectus supplement for BCAP 2007-AA5 was filed with the SEC and is available at http://www.sec.gov/Archives/edgar/data/1337454/000091412107002164/by10240985-424b3.txt.

COMPLAINT FOR RESCISSION – Page 46

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

137.   Many of the statements of material fact that Barclays Capital and BCAP made in these documents were untrue or misleading. These untrue or misleading statements included the following.

**A.   Untrue or Misleading Statements about the Loan-to-Value Ratios (LTVs) and Combined Loan-to-Value Ratios (CLTVs) of the Mortgage Loans in the Collateral Pool of this Securitization**

**1.   The materiality of LTVs and CLTVs**

138.   Seattle Bank repeats paragraphs 24 through 29.

**2.   Untrue or misleading statements by Barclays Capital and BCAP about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization**

139.   In the prospectus supplement and other documents they sent to Seattle Bank, Barclays Capital and BCAP made the following statements about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization.

a.   "Approximately 1.68% of the mortgage loans had loan-to-value ratios greater than 80% at origination." BCAP 2007-AA5 Pros. Sup. S-29, S-33.

b.   "The weighted average loan-to-value ratio at origination of the mortgage loans is approximately 70.18% and approximately 1.68% of the mortgage loans had loan-to-value ratios at origination exceeding 80.00%." BCAP 2007-AA5 Pros. Sup. S-36.

c.   The weighted average original LTV of the mortgage loans was 70.18%, and the weighted average combined original LTV of the mortgage loans was 75.46%. BCAP 2007-AA5 Pros. Sup., sched. A, at 1.

COMPLAINT FOR RESCISSION – Page 47

d.      In Schedule A of the prospectus supplement ("Mortgage Loan Statistical Information"), Barclays Capital and BCAP presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, cut-off date principal balance) and divided the loans into groups based on that characteristic (for example, loans with principal balances at the cut-off date of $250,001 to $275,000, $400,001 to $425,000, $425,001 to $450,000, etc.). Each table then presented various data about the loans in each group. Among these data was the "Weighted Average Original LTV" of the loans in each group. There were 31 such tables in Schedule A for all loans in the collateral pool. In each table, the number of groups into which the loans are divided ranged from one to 27. Thus, in Schedule A, Barclays Capital and BCAP made hundreds of statements about the weighted average original LTVs of the loans in the collateral pool. BCAP 2007-AA5 Pros. Sup., sched. A.

140.    These statements were untrue or misleading because (i) the stated LTVs and CLTVs of a significant number of those mortgage loans were lower than the actual LTVs and CLTVs; (ii) Barclays Capital and BCAP omitted to state that the appraisals of a significant number of the properties that secured the mortgage loans in the collateral pool were biased upward, so that stated LTVs and CLTVs of those mortgage loans based on those appraisals were lower than the true LTVs and CLTVs of those mortgage loans; or (iii) the stated CLTVs did not reflect second mortgages on a significant number of the properties that secured the mortgage loans in the collateral pool.

141.    By these untrue and misleading statements, Barclays Capital and BCAP materially understated the risk of the certificate issued by BCAP LLC Trust 2007-AA5 that they offered and sold to Seattle Bank.

COMPLAINT FOR RESCISSION – Page 48

3.      **Basis of the allegations above that these statements by Barclays Capital and BCAP about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization were untrue or misleading**

a.      **Upward bias in appraisals**

142.    Seattle Bank repeats paragraphs 35 through 39.

143.    It is very probable that, because there was upward bias in appraisals throughout the mortgage loan industry during the time before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had upwardly biased appraisals.

b.      **Evidence of untrue or misleading statements about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization specifically**

144.    Since the date of this securitization, 15 of the 324 mortgage loans in the collateral pool have been foreclosed upon. Those 15 properties were sold for a total of approximately $6,772,043 in foreclosure. The total value ascribed to those same properties in the LTV and CLTV data reported in the prospectus supplement and other documents Barclays Capital and BCAP sent to Seattle Bank was $10,212,500. Thus, those properties were sold for 66.3% of the value ascribed to them, a difference of 33.7%. This large difference is evidence that the values ascribed to those properties, and to all properties in the collateral pool, in the LTV and CLTV data reported in the prospectus supplement and other documents Barclays Capital and BCAP sent to Seattle Bank were too high, the resulting LTVs and CLTVs were too low, and thus that the statements in the prospectus supplement and other documents sent to Seattle Bank about the LTVs and CLTVs were untrue or misleading. The difference cannot be explained by the declines in house prices in the areas in which those properties were located (even after taking account of the fact that

COMPLAINT FOR RESCISSION – Page 49

properties in foreclosure may sometimes sell for less than their fair market value). Analysis

of data in an industry-standard database of securitized mortgage loans shows that the

differences between the values ascribed to these properties and the prices at which the

properties were sold in foreclosure are significantly greater than the declines in house prices

in the same geographical areas over the same periods (that is, between the making of each

mortgage loan and the corresponding foreclosure sale).

### c.    Undisclosed "silent second" mortgages

145.    Seattle Bank repeats paragraph 46.

146.    It is very probable that, because 25% or more of all securitized

nonconforming first mortgage loans in the United States had silent seconds during the time

before this securitization, a significant number of mortgage loans in the collateral pool of

this securitization had silent seconds.

**B.    Untrue or Misleading Statements about the Occupancy Status of the Properties
That Secured the Mortgage Loans in the Collateral Pool of this Securitization**

### 1.    The materiality of occupancy status

147.    Seattle Bank repeats paragraphs 48 through 49.

### 2.    Untrue or misleading statements by Barclays Capital and BCAP about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization

148.    In the prospectus supplement and other documents they sent to Seattle Bank,

Barclays Capital and BCAP made the following statements about the occupancy status of

the properties that secured the mortgage loans in the collateral pool of this securitization.

a.    In Schedule A of the prospectus supplement described in paragraph

139, Barclays Capital and BCAP presented a table entitled "Occupancy." This table divided

COMPLAINT FOR RESCISSION – Page 50

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

1    the loans in the collateral pool into the categories "Primary," "Investment," and "Second

2    Home." For each category, the table stated the number of mortgage loans in that category

3    and gave eight other items of information about them. BCAP 2007-AA5 Pros. Sup., sched.

4    A, at 6.

5           b.       In the "Occupancy" table, Barclays Capital and BCAP stated that

6    80.93% of the mortgage loans in the collateral pool, by aggregate principal balance

7    outstanding, were secured by a "Primary" residence, 12.25% were secured by an

8    "Investment" property, and 6.82% were secured by a "Second Home." BCAP 2007-AA5

9    Pros. Sup., sched. A, at 6.

10          149.    These statements were untrue or misleading because (i) the stated number of

11   mortgage loans in the category "Primary" was higher than the actual number of loans in that

12   category; (ii) the stated number of mortgage loans in the category "Investment" was lower

13   than the actual number of loans in that category; (iii) the stated number of mortgage loans

14   in the category "Second Home" was lower than the actual number of loans in that category;

15   or (iv) Barclays Capital and BCAP omitted to state that the occupancy status of a significant

16   number of the properties that secured the mortgage loans in the collateral pool was

17   misstated because of fraud.

18          150.    By these untrue and misleading statements, Barclays Capital and BCAP

19   materially understated the risk of the certificate issued by BCAP LLC Trust 2007-AA5 that

20   they offered and sold to Seattle Bank.

COMPLAINT FOR RESCISSION – Page 51

iii
YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

**3.      Basis of the allegations above that these statements by Barclays Capital and BCAP about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization were untrue or misleading**

151.    Seattle Bank repeats paragraphs 53 through 54.

152.    It is very probable that, because there was widespread occupancy fraud throughout the mortgage loan industry during the time before this securitization, a significant number of the applicants for mortgage loans in the collateral pool of this securitization stated incorrectly that the properties that would secure the mortgage loans were to be their primary residences.

**C.      Misleading Statements about the FICO Scores of the Borrowers Whose Mortgage Loans Were in the Collateral Pool of this Securitization**

**1.      The materiality of FICO scores**

153.    Seattle Bank repeats paragraphs 56 through 57.

**2.      Misleading statements by Barclays Capital and BCAP about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization**

154.    In the prospectus supplement and other documents they sent to Seattle Bank, Barclays Capital and BCAP made the following statements about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization.

         a.      The non-zero weighted average FICO score of the borrowers of all of the mortgage loans in the collateral pool was 722. BCAP 2007-AA5 Pros. Sup., sched. A, at 1.

         b.      In Schedule A of the prospectus supplement described in paragraph 139, Barclays Capital and BCAP presented 31 tables of statistics about the mortgage loans in the collateral pool. In each table, the number of categories into which the loans are

COMPLAINT FOR RESCISSION – Page 52

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

divided ranged from one to 27. Among the data presented in each table was the "Non-Zero

Weighted Average FICO" of the loans in each group. Thus, in Schedule A, Barclays Capital

and BCAP made hundreds of statements about the weighted average FICO scores of the

loans in the collateral pool. BCAP 2007-AA5 Pros. Sup., sched. A.

155.    These statements were misleading because Barclays Capital and BCAP

omitted to state that a significant number of borrowers of the mortgage loans in the

collateral pool of this securitization inflated their FICO scores.

156.    By these misleading statements, Barclays Capital and BCAP materially

understated the risk of the certificate issued by BCAP LLC Trust 2007-AA5 that they

offered and sold to Seattle Bank.

**3.    Basis of the allegations above that these statements by Barclays Capital and BCAP about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization were misleading**

157.    Seattle Bank repeats paragraphs 61 through 62.

158.    It is very probable that, because tradeline renting was widespread throughout

the nonconforming mortgage loan industry during the time before this securitization, many

of the borrowers of the mortgage loans in the collateral pool of this securitization raised

their FICO scores by tradeline renting.

**D.    Untrue or Misleading Statements about the Debt-To-Income Ratios (DTIs) of the Borrowers Whose Mortgage Loans Were in the Collateral Pool of this Securitization**

**1.    The materiality of DTIs**

159.    Seattle Bank repeats paragraphs 110 through 111.

COMPLAINT FOR RESCISSION – Page 53

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

**2.**      **Untrue or misleading statements by Barclays Capital and BCAP about the DTIs of the borrowers whose mortgage loans were in the collateral pool of this securitization**

160.    In the prospectus supplement and other documents they sent to Seattle Bank, Barclays Capital and BCAP made the following statements about the DTIs of the borrowers whose mortgage loans were in the collateral pool of this securitization.

a.      In Schedule A of the prospectus supplement described in paragraph 139, Barclays Capital and BCAP presented 31 tables of statistics about the mortgage loans in the collateral pool. In each table, the number of categories into which the loans are divided ranged from one to 27. Among the data presented in each table was the "Non-Zero Weighted Average DTI" of the loans in each group. Thus, in Schedule A, Barclays Capital and BCAP made hundreds of statements about the weighted average DTIs of the loans in the collateral pool. BCAP 2007-AA5 Pros. Sup., sched. A.

161.    These statements were untrue or misleading because (i) the stated weighted average DTIs were lower than the actual weighted average DTIs or (ii) Barclays Capital and BCAP omitted to state that the DTIs of a significant number of borrowers were understated because of fraud.

162.    By these misleading statements, Barclays Capital and BCAP materially understated the risk of the certificate issued by BCAP LLC Trust 2007-AA5 that they offered and sold to Seattle Bank.

**3.**      **Basis of the allegations above that these statements by Barclays Capital and BCAP about the DTIs of the borrowers whose mortgage loans were in the collateral pool of this securitization were untrue or misleading**

163.    Seattle Bank repeats paragraphs 115 through 116.

COMPLAINT FOR RESCISSION – Page 54

ili

YARMUTH  WILSDON  CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

164.    It is very probable that, because overstatement of income and resulting understatement of DTI were widespread in the nonconforming mortgage loan industry during the time before this securitization, the incomes of many of the borrowers of the mortgage loans in the collateral pool of this securitization were overstated on their applications for the loans. As a result, the reported DTIs of these borrowers were lower than the actual DTIs.

**E.    Failure to Disclose the Substantial Deterioration of LTV and FICO Score as Predictors of the Performance of Mortgage Loans Originated by Countrywide Home Loans, Inc.**

165.    Seattle Bank repeats paragraphs 138 through 164.

166.    Seattle Bank repeats paragraph 65.

167.    In the prospectus supplement and other documents they sent to Seattle Bank, Barclays Capital and BCAP made statements about the LTVs and FICO scores of the mortgage loans in the collateral pool, as summarized above. All of those statements are incorporated in this paragraph by reference.

168.    During the time before this securitization, the power of LTV and FICO score to predict the performance of otherwise similar nonconforming mortgage loans deteriorated, even after taking account of declines in house prices and other macroeconomic factors. Put somewhat differently, loans that were very similar in these characteristics performed worse if the loans were made in 2007 than if they were made in 2006, worse if made in 2006 than if made in 2005, etc.

169.    This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true in particular of nonconforming loans originated by Countrywide Home Loans, Inc., the originator of the mortgage loans in the collateral pool

COMPLAINT FOR RESCISSION – Page 55

ili
YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

of this securitization. The lines in Figure 3 show, for all nonconforming loans originated by Countrywide Home Loans, Inc., that the weighted-average reported LTV and weighted-average reported FICO score were nearly constant. Despite the stability of these important credit characteristics, however, the actual credit quality of nonconforming loans originated by Countrywide Home Loans, Inc. deteriorated steadily during the time before this securitization. The bars in Figure 3 show early payment defaults, that is, the percent of loans (by outstanding principal balance) that became 60 or more days delinquent within six months after they were made. An early payment default is usually the result of poor credit quality and poor underwriting of the loan when it was made, rather than of macroeconomic factors after it was made. As Figure 3 makes clear, the credit quality of the loans originated by Countrywide Home Loans, Inc. deteriorated steadily from quarter to quarter from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.



YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

170.    Figure 4 further illustrates the undisclosed deterioration in the credit quality of nonconforming loans originated by Countrywide Home Loans, Inc., which had nearly constant weighted-average reported LTVs and FICO scores. Figure 4 shows, for each month after origination, the percentage (by outstanding principal balance) of nonconforming mortgage loans originated by Countrywide Home Loans, Inc. in each of 2004, 2005, 2006, and 2007 that were 60 or more days delinquent. As Figure 4 makes clear, the credit quality of the loans originated by Countrywide Home Loans, Inc. deteriorated steadily from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.



Figure 4: Percent of Loans Originated by Countrywide Home Loans, Inc. 60+ Delinquent in Each Month After Origination, by Year of Origination

171.    All statements that Barclays Capital and BCAP made about the LTVs and credit scores of the mortgage loans in the collateral pool of this securitization were misleading because those defendants omitted to state that, in the time before this

COMPLAINT FOR RESCISSION – Page 57

securitization, loans that Countrywide Home Loans, Inc. originated were nearly constant in weighted average LTV and weighted average FICO score, yet performed worse if the loans were made in 2007 than if they were made in 2006, worse if made in 2006 than if made in 2005, etc.

172.    By these misleading statements, Barclays Capital and BCAP materially understated the risk of the certificate issued by BCAP LLC Trust 2007-AA5 that they offered and sold to Seattle Bank.

**F.    Untrue or Misleading Statements about the Underwriting Guidelines of the Originator of the Mortgage Loans in the Collateral Pool of this Securitization**

**1.    The materiality of underwriting guidelines and the extent of compliance with them**

173.    Seattle Bank repeats paragraph 72.

**2.    Untrue or misleading statements by Barclays Capital and BCAP about the underwriting guidelines of the originator of the mortgage loans in the collateral pool of this securitization and about the extent of their compliance with those guidelines**

174.    On pages S-41 through S-46 of the prospectus supplement Barclays Capital and BCAP made statements about the underwriting guidelines of Countrywide Home Loans, Inc. the originator of the mortgage loans in the collateral pool of this securitization. All of those statements are incorporated here by reference.

175.    One of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." BCAP 2007-AA5 Pros. Sup. S-42.

176.    On information and belief, these statements were untrue or misleading because Barclays Capital and BCAP omitted to state that: (a) Countrywide Home Loans,

COMPLAINT FOR RESCISSION – Page 58

1  Inc. was making frequent, and increasingly frequent, exceptions to those underwriting

2  guidelines; (b) Countrywide Home Loans, Inc. was making frequent, and increasingly

3  frequent, exceptions to those underwriting guidelines when no compensating factor was

4  present; and (c) Countrywide Home Loans, Inc. was failing frequently, and increasingly

5  frequently, to follow quality-assurance practices intended to detect and prevent fraud.

6  

7          177.    By these untrue or misleading statements, Barclays Capital and BCAP

8  materially understated the risk of the certificate issued by BCAP LLC Trust 2007-AA5 that

9  they offered and sold to Seattle Bank.

10

11          **3.    Basis of the allegations above that these statements by Barclays Capital
           and BCAP about the underwriting guidelines of the originator of the
12           mortgage loans in the collateral pool of this securitization, and about the
           extent of their compliance with those guidelines, were untrue or
13           misleading**

14          178.    Seattle Bank repeats paragraph 77.

15          179.    The general relaxation of lending standards that took place before the time of

16  this securitization in most or all originators of nonconforming mortgage loans took place

17  specifically at Countrywide Home Loans, Inc., the originator of the mortgage loans in this

18  securitization. A federal investigation into Countrywide's lending practices revealed that

19  "loan documents were often marked by dubious or erroneous information." One former

20  Countrywide manager, who pleaded guilty to two counts of wire-fraud, said that "[i]f you

21  had a pulse, [Countrywide] gave you a loan," and that the practice of pushing through loans

22  with false information was common. Another account manager claimed that Countrywide

23  was "infested" with employees who violated company standards to underwrite loans. For

24  instance, one borrower, a personal trainer who made less than $20,000 per year, claimed

25  that her Countrywide loan application listed her income as more than four times that

COMPLAINT FOR RESCISSION – Page 59

1    amount, and qualified her for a mortgage where the payment was $500 more than her

2    monthly income.

3

4    **G.    Claim for Rescission**

5        180.    Under RCW 21.20.010 and 21.20.430(1), Seattle Bank is entitled to recover

6    the consideration that it paid for this certificate, $140,000,000, plus interest of 8% per

7    annum from September 21, 2007, to the date on which it recovers the $140,000,000, plus its

8    costs and the reasonable fees of its attorneys in this action, minus the amount of income it

9    has received on the certificate. Pursuant to RCW 21.20.430(6), Seattle Bank will tender the

10   certificate before entry of judgment.

11

12                    **VIII. FOURTH CLAIM FOR RELIEF**

13                *Certificate*:    One certificate in tranche I-2-A-1 of
                                    BCAP LLC Trust, Mortgage-Backed
14                                  Pass-Through Certificates, Series
                                    2007-AA2
15
            *Date of Purchase*:    March 29, 2007
16
          *Consideration Paid*:    $100,000,000
17
               *Underwriter*:      Barclays Capital
18
            *Depositor/Issuer*:    BCAP

19   *Controlling Person of Depositor/Issuer*:    Barclays Bank PLC

20       181.    Seattle Bank repeats paragraphs 1 through 17.

21       182.    BCAP LLC Trust, Mortgage-Backed Pass-Through Certificates, Series

22   2007-AA2 was a securitization in March 2007 of approximately 4,514 mortgage loans, in

23   two groups, with an aggregate principal balance of approximately $1,474,020,700. The

24   mortgage loans in Group I (from which Seattle Bank's certificate was to be paid) were

25

26

COMPLAINT FOR RESCISSION – Page 60

originated by Countrywide Home Loans, Inc. The loans were "nonconforming," that is they did not conform to credit standards promulgated by Fannie Mae and Freddie Mac.

183.    Barclays Capital and BCAP offered and sold to Seattle Bank a senior certificate in this securitization, in tranche I-2-A-1, for which Seattle Bank paid $100,000,000 on March 29, 2007.

184.    In connection with their offer and sale of this certificate to Seattle Bank, Barclays Capital and BCAP sent numerous documents to Seattle Bank at its office in King County. These documents included the prospectus supplement filed with the SEC for this securitization,[6] drafts of some of the statistical tables to be included in the prospectus supplement, and a computer model of the financial structure of the securitization. In these documents Barclays Capital and BCAP made statements of material fact about the certificate that they offered and sold to Seattle Bank.

185.    Seattle Bank relied on the statements by Barclays Capital and BCAP in these documents in deciding to purchase this certificate. It was reasonable for Seattle Bank to rely on the statements in these documents.

186.    Many of the statements of material fact that Barclays Capital and BCAP made in these documents were untrue or misleading. These untrue or misleading statements included the following.

---

[6] The prospectus supplement for BCAP 2007-AA2 was filed with the SEC and is available at http://www.sec.gov/Archives/edgar/data/1394025/000091412107000906/by7969877-424b5.txt.

COMPLAINT FOR RESCISSION – Page 61

**A.    Untrue or Misleading Statements about the Loan-to-Value Ratios (LTVs) and Combined Loan-to-Value Ratios (CLTVs) of the Mortgage Loans in the Collateral Pool of this Securitization**

**1.    The materiality of LTVs and CLTVs**

187.    Seattle Bank repeats paragraphs 24 through 29.

**2.    Untrue or misleading statements by Barclays Capital and BCAP about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization**

188.    In the prospectus supplement and other documents they sent to Seattle Bank, Barclays Capital and BCAP made the following statements about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization.

a.    "Approximately 7.90% and 2.87% of the subgroup I-1 mortgage loans and the subgroup I-2 mortgage loans, respectively, . . . had loan-to-value ratios greater than 80% at origination." BCAP 2007-AA2 Pros. Sup. S-46.

b.    "Approximately 5.14% of the Group I Mortgage Loans . . . had original loan-to-value ratios greater than 80% at origination." BCAP 2007-AA2 Pros. Sup. S-52.

c.    "The weighted average loan-to-value ratio at origination of the Group I Mortgage Loans is approximately 73.40% and approximately 5.14% of the Group I Mortgage Loans had loan-to-value ratios at origination exceeding 80.00%." BCAP 2007-AA2 Pros. Sup. S-55

d.    "The weighted average loan-to-value ratio at origination of the Subgroup I-1 Mortgage Loans is approximately 71.77% and approximately 7.90% of the Subgroup I -1 Mortgage Loans had loan-to-value ratios at origination exceeding 80.00%." BCAP 2007-AA2 Pros. Sup. S-56.

COMPLAINT FOR RESCISSION – Page 62

YARMUTH  WILSDON  CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

e.      "The weighted average loan-to-value ratio at origination of the Subgroup I-2 Mortgage Loans is approximately 74.74% and approximately 2.87% of the Subgroup I-2 Mortgage Loans had loan-to-value ratios at origination exceeding 80.00%." BCAP 2007-AA2 Pros. Sup. S-57.

f.      The weighted average original LTV of the subset of mortgage loans in Group I was 73.40%, and the weighted average combined original LTV of the subset of mortgage loans in Group I was 80.20%. BCAP 2007-AA2 Pros. Sup., sched. A, Group I, at 1.

g.      The weighted average original LTV of the subset of mortgage loans in Group I-1 was 71.77%, and the weighted average combined original LTV of the subset of mortgage loans in Group I-1 was 76.34%. BCAP 2007-AA2 Pros. Sup., sched. A, Group I-1, at 1.

h.      The weighted average original LTV of the subset of mortgage loans in Group I-2 was 74.74%, and the weighted average combined original LTV of the subset of mortgage loans in Group I-2 was 83.37%. BCAP 2007-AA2 Pros. Sup., sched. A, Group I-2, at 1.

i.      In Schedule A of the prospectus supplement ("Mortgage Loan Statistical Information") Barclays Capital and BCAP presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, cut-off date principal balance) and divided the loans into groups based on that characteristic (for example, loans with principal balances at the cut-off date of $1 to 25,000, $25,001 to $50,000, $50,001 to $75,000, etc.). Each table then presented various data about the loans in each group. Among these data was the "Weighted Average

COMPLAINT FOR RESCISSION – Page 63

Combined Original LTV" of the loans in each group. There were 29 such tables in Schedule A for all loans in Group I. In each table, the number of groups into which the loans are divided ranged from one to 55. Thus, in Schedule A, Barclays Capital and BCAP made hundreds of statements about the original weighted-average LTVs of the loans in the collateral pool. BCAP 2007-AA2 Pros. Sup., sched. A, Group I.

j.    Schedule A also presented similar tables of statistics about the loans in Group I-1. In these tables, Barclays Capital and BCAP similarly made hundreds of statements about the weighted average combined original LTVs of the loans in Group I-1. BCAP 2007-AA2 Pros. Sup., sched. A, Group I-1.

k.    Schedule A also presented similar tables of statistics about the loans in Group I-2. In these tables, Barclays Capital and BCAP similarly made hundreds of statements about the weighted average combined original LTVs of the loans in Group I-2. BCAP 2007-AA2 Pros. Sup., sched. A, Group I-2.

189.    These statements were untrue or misleading because (i) the stated LTVs and CLTVs of a significant number of those mortgage loans were lower than the actual LTVs and CLTVs; (ii) Barclays Capital and BCAP omitted to state that the appraisals of a significant number of the properties that secured the mortgage loans in the collateral pool were biased upward, so that stated LTVs and CLTVs of those mortgage loans based on those appraisals were lower than the true LTVs and CLTVs of those mortgage loans; or (iii) the stated CLTVs did not reflect second mortgages on a significant number of the properties that secured the mortgage loans in the collateral pool.

COMPLAINT FOR RESCISSION – Page 64

YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

190.    By these untrue and misleading statements, Barclays Capital and BCAP materially understated the risk of the certificate issued by BCAP LLC Trust 2007-AA2 that they offered and sold to Seattle Bank.

3.    **Basis of the allegations above that these statements by Barclays Capital and BCAP about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization were untrue or misleading**

a.    **Upward bias in appraisals**

191.    Seattle Bank repeats paragraphs 35 through 39.

192.    It is very probable that, because there was upward bias in appraisals throughout the mortgage loan industry during the time before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had upwardly biased appraisals.

b.    **Evidence of untrue or misleading statements about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization specifically**

193.    Since the date of this securitization, 328 of the 4,514 mortgage loans in the collateral pool have been foreclosed upon. Those 328 properties were sold for a total of approximately $85,740,619 in foreclosure. The total value ascribed to those same properties in the LTV and CLTV data reported in the prospectus supplement and other documents Barclays Capital and BCAP sent to Seattle Bank was $143,984,238. Thus, those properties were sold for 59.55% of the value ascribed to them, a difference of 40.45%. This large difference is evidence that the values ascribed to those properties, and to all properties in the collateral pool, in the LTV and CLTV data reported in the prospectus supplement and other documents Barclays Capital and BCAP sent to Seattle Bank were too high, the resulting LTVs and CLTVs were too low, and thus that the statements in the prospectus

COMPLAINT FOR RESCISSION – Page 65

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

supplement and other documents sent to Seattle Bank about the LTVs and CLTVs were

untrue or misleading. The difference cannot be explained by the declines in house prices in

the areas in which those properties were located located (even after taking account of the

fact that properties in foreclosure may sometimes sell for less than their fair market value).

Analysis of data in an industry-standard database of securitized mortgage loans shows that

the differences between the values ascribed to these properties and the prices at which the

properties were sold in foreclosure are significantly greater than the declines in house prices

in the same geographical areas over the same periods (that is, between the making of each

mortgage loan and the corresponding foreclosure sale).

> **c.      Undisclosed "silent second" mortgages**

194.    Seattle Bank repeats paragraph 46.

195.    It is very probable that, because 25% or more of all securitized

nonconforming first mortgage loans in the United States had silent seconds during the time

before this securitization, a significant number of mortgage loans in the collateral pool of

this securitization had silent seconds.

**B.      Untrue or Misleading Statements about the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pool of this Securitization**

> **1.      The materiality of occupancy status**

196.    Seattle Bank repeats paragraphs 48 through 49.

COMPLAINT FOR RESCISSION – Page 66

**2.**    **Untrue or misleading statements by Barclays Capital and BCAP about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization**

197.    In the prospectus supplement and other documents they sent to Seattle Bank, Barclays Capital and BCAP made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

a.    In Schedule A of the prospectus supplement described in paragraph 188, Barclays Capital and BCAP presented a table entitled "Occupancy." This table divided the loans in the collateral pool into the categories "Primary," "Investment," and "Second Home." For each category, the table stated the number of mortgage loans in that category and gave eight other items of information about them. BCAP 2007-AA2 Pros. Sup., sched. A, Group I, at 7.

b.    In the "Occupancy" table, Barclays Capital and BCAP stated that 74.59% of the mortgage loans in the collateral pool, by aggregate principal balance outstanding, were secured by a "Primary" residence, 18.24% were secured by an "Investment" property, and 7.17% were secured by a "Second Home." BCAP 2007-AA2 Pros. Sup., sched. A, Group I, at 7.

c.    Schedule A also presented a similar table divided into three categories of occupancy status for the subset of loans in Group I-1. In this table, Barclays Capital and BCAP stated that 60.47% of the loans in Group I-1, by aggregate principal balance outstanding, were secured by a "Primary" residence, 30.58% were secured by an "Investment" property and 8.95% were secured by a "Second Home." BCAP 2007-AA2 Pros. Sup., sched. A, Group I-1, at 7.

COMPLAINT FOR RESCISSION – Page 67

YARMUTH  WILSDON  CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

d.      Schedule A also presented a similar table divided into three categories of occupancy status for the subset of loans in Group I-2. In this table, Barclays Capital and BCAP stated that 86.20% of the loans in Group I-2, by aggregate principal balance outstanding, were secured by a "Primary" residence, 8.10% were secured by an "Investment" property and 5.70% were secured by a "Second Home." BCAP 2007-AA2 Pros. Sup., Group I-2, at 7.

198.    These statements were untrue or misleading because (i) the stated number of mortgage loans in the category "Primary" was higher than the actual number of loans in that category; (ii) the stated number of mortgage loans in the category "Investment" was lower than the actual number of loans in that category; (iii) the stated number of mortgage loans in the category "Second Home" was lower than the actual number of loans in that category; or (iv) Barclays Capital and BCAP omitted to state that the occupancy status of a significant number of the properties that secured the mortgage loans in the collateral pool was misstated because of fraud.

199.    By these untrue and misleading statements, Barclays Capital and BCAP materially understated the risk of the certificate issued by BCAP LLC Trust 2007-AA2 that they offered and sold to Seattle Bank.

**3.      Basis of the allegations above that these statements by Barclays Capital and BCAP about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization were untrue or misleading**

200.    Seattle Bank repeats paragraphs 53 through 54.

201.    It is very probable that, because there was widespread occupancy fraud throughout the nonconforming mortgage loan industry during the time before this

COMPLAINT FOR RESCISSION – Page 68

III
YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

securitization, a significant number of the applicants for mortgage loans in the collateral pool of this securitization stated incorrectly that the properties that would secure the mortgage loans were to be their primary residences.

**C.    Misleading Statements about the FICO Scores of the Borrowers Whose Mortgage Loans Were in the Collateral Pool of this Securitization**

**1.    The materiality of FICO scores**

202.    Seattle Bank repeats paragraphs 56 through 57.

**2.    Misleading statements by Barclays Capital and BCAP about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization**

203.    In the prospectus supplement and other documents they sent to Seattle Bank, Barclays Capital and BCAP made the following statements about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization.

a.    The non-zero weighted average FICO score of the borrowers of the loans in Group I of the collateral pool was 706. BCAP 2007-AA2 Pros. Sup., sched. A, Group I, at 1.

b.    In Schedule A of the prospectus supplement described in paragraph 188, Barclays Capital and BCAP presented 29 tables of statistics about the mortgage loans in Group I. In each table, the number of categories into which the loans are divided ranged from one to 55. Among the data presented in each table was the "Non-Zero Weighted Average FICO" of the loans in each category. Thus, in Schedule A, Barclays Capital and BCAP made hundreds of statements about the weighted average FICO scores of the loans in Group I of the collateral pool. BCAP 2007-AA2 Pros. Sup., sched. A, Group I.

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

1

2     c.      Schedule A also presented similar tables of statistics about the subset

3     of loans in Group I-1. In these tables, Barclays Capital and BCAP similarly made hundreds

4     of statements about the weighted average FICO scores of the loans in Group I-1. BCAP

5     2007-AA2 Pros. Sup., sched. A, Group I-1.

6     d.      Schedule A also presented similar tables of statistics about the subset

7     of loans in Group I-2. In these tables, Barclays Capital and BCAP similarly made hundreds

8     of statements about the weighted average FICO scores of the loans in Group I-2. BCAP

9     2007-AA2 Pros. Sup., sched. A, Group I-2.

10    e.      The non-zero weighted average FICO score of the borrowers of the

11    subset of loans in Group I-1 of the collateral pool was 701. BCAP 2007-AA2 Pros. Sup.,

12    sched. A, Group I-1, at 1.

13

14    f.      The non-zero weighted average FICO score of the borrowers of the

15    loans in Group I-2 of the collateral pool was 710. BCAP 2007-AA2 Pros. Sup., sched. A,

16    Group I-2, at 1.

17    204.    These statements were misleading because Barclays Capital and BCAP

18    omitted to state that a significant number of borrowers of the mortgage loans in the

19    collateral pool of this securitization inflated their FICO scores.

20

21    205.    By these misleading statements, Barclays Capital and BCAP materially

22    understated the risk of the certificate issued by BCAP LLC Trust 2007-AA2 that they

23    offered and sold to Seattle Bank.

24

25    **3.      Basis of the allegations above that these statements by Barclays Capital
        and BCAP about the FICO scores of the borrowers whose mortgage
        loans were in the collateral pool of this securitization were misleading**

26    206.    Seattle Bank repeats paragraphs 61 through 62.

COMPLAINT FOR RESCISSION – Page 70

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

207.    It is very probable that, because tradeline renting was widespread throughout the nonconforming mortgage loan industry during the time before this securitization, many of the borrowers of the mortgage loans in the collateral pool of this securitization raised their FICO scores by tradeline renting.

**D.    Untrue or Misleading Statements about the Debt-To-Income Ratios (DTIs) of the Borrowers Whose Mortgage Loans Were in the Collateral Pool of this Securitization**

**1.    The materiality of DTIs**

208.    Seattle Bank repeats paragraphs 110 through 111.

**2.    Untrue or misleading statements by Barclays Capital and BCAP about the DTIs of the borrowers whose mortgage loans were in the collateral pool of this securitization**

209.    In the prospectus supplement and other documents they sent to Seattle Bank, Barclays Capital and BCAP made the following statements about the DTIs of the borrowers whose mortgage loans were in the collateral pool of this securitization.

a.    In Schedule A of the prospectus supplement described in paragraph 188, Barclays Capital and BCAP presented 29 tables of statistics about the mortgage loans in Group I. In each table, the number of categories into which the loans are divided ranged from one to 55. Among the data presented in each table was the "Non-Zero Weighted Average DTI" of the loans in each category. Thus, in Schedule A, Barclays Capital and BCAP made hundreds of statements about the weighted average DTIs of the loans in Group I. BCAP 2007-AA2 Pros. Sup., sched. A, Group I.

b.    Schedule A also presented similar tables of statistics about the subset of loans in Group I-1. In these tables, Barclays Capital and BCAP similarly made hundreds

COMPLAINT FOR RESCISSION – Page 71

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

of statements about the weighted average DTIs of the loans in Group I-1. BCAP 2007-AA2

Pros. Sup., sched. A, Group I-1.

        c.      Schedule A also presented similar tables of statistics about the subset

of loans in Group I-2. In these tables, Barclays Capital and BCAP similarly made hundreds

of statements about the weighted average DTIs of the loans in Group I-2. BCAP 2007-AA2

Pros. Sup., sched. A, Group I-2.

210.    These statements were untrue or misleading because (i) the stated weighted

average DTIs were lower than the actual weighted average DTIs, or (ii) Barclays Capital

and BCAP omitted to state that the DTIs of a significant number of borrowers were

understated because of fraud.

211.    By these misleading statements, Barclays Capital and BCAP materially

understated the risk of the certificate issued by BCAP LLC Trust 2007-AA2 that they

offered and sold to Seattle Bank.

        **3.**        **Basis of the allegations above that these statements by Barclays Capital and BCAP about the DTIs of the borrowers whose mortgage loans were in the collateral pool of this securitization were untrue or misleading**

212.    Seattle Bank repeats paragraphs 115 through 116.

213.    It is very probable that, because overstatement of income and resulting

understatement of DTI were widespread in the nonconforming loan industry during the time

before this securitization, the incomes of many of the borrowers of the mortgage loans in

the collateral pool of this securitization were overstated on their applications for the loans.

As a result, the reported DTIs of these borrowers were lower than the actual DTIs.

COMPLAINT FOR RESCISSION – Page 72

YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

E.   **Failure to Disclose the Substantial Deterioration of LTV and FICO Score as Predictors of the Performance of Mortgage Loans Originated by Countrywide Home Loans, Inc.**

214.   Seattle Bank repeats paragraphs 187 through 213.

215.   Seattle Bank repeats paragraph 65.

216.   In the prospectus supplement and other documents they sent to Seattle Bank, Barclays Capital and BCAP made statements about the LTVs and FICO scores of the mortgage loans in the collateral pool, as summarized above. All of those statements are incorporated in this paragraph by reference.

217.   During the time before this securitization, the power of LTV and FICO score to predict the performance of otherwise similar nonconforming mortgage loans deteriorated, even after taking account of declines in house prices and other macroeconomic factors. Put somewhat differently, loans that were very similar in these characteristics performed worse if the loans were made in 2007 than if they were made in 2006, worse if made in 2006 than if made in 2005, etc.

218.   This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true in particular of nonconforming loans originated by Countrywide Home Loans, Inc., the originator of the mortgage loans in the collateral pool of this securitization. As Figure 3 in paragraph 169 makes clear, the credit quality of the loans originated by Countrywide Home Loans, Inc. deteriorated steadily from quarter to quarter from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores. As Figure 4 in paragraph 170 makes clear, the credit quality of the loans originated by Countrywide Home Loans, Inc. deteriorated steadily from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.

COMPLAINT FOR RESCISSION – Page 73

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

1

2    219.    All statements that Barclays Capital and BCAP made about the LTVs and

3    FICO scores of the mortgage loans in the collateral pool of this securitization were

4    misleading because those defendants omitted to state that, in the time before this

5    securitization, loans that Countrywide Home Loans, Inc. originated were nearly constant in

6    weighted average LTV and weighted average FICO score, yet performed worse if the loans

7    were made in 2007 than if they were made in 2006, worse if made in 2006 than if made in

8    2005, etc.

9    220.    By these misleading statements, Barclays Capital and BCAP materially

10   understated the risk of the certificate issued by BCAP LLC Trust 2007-AA2 that they

11   offered and sold to Seattle Bank.

12

13   **F.    Untrue or Misleading Statements about the Underwriting Guidelines of the Originator of the Mortgage Loans in the Collateral Pool of this Securitization**

14

15       **1.    The materiality of underwriting guidelines and the extent of compliance with them**

16   221.    Seattle Bank repeats paragraph 72.

17

18       **2.    Untrue or misleading statements by Barclays Capital and BCAP about the underwriting guidelines of the originator of the mortgage loans in the collateral pool of this securitization and about the extent of their compliance with those guidelines**

19

20   222.    On pages S-66 through S-71 of the prospectus supplement Barclays Capital

21   and BCAP made statements about the underwriting guidelines of Countrywide Home

22   Loans, Inc. the originator of the mortgage loans in this securitization. All of those

23   statements are incorporated here by reference.

24

25

26

COMPLAINT FOR RESCISSION – Page 74

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

223.    One of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." BCAP 2007-AA2 Pros. Sup. S-67.

224.    On information and belief, these statements were untrue or misleading because Barclays Capital and BCAP omitted to state that: (a) Countrywide Home Loans, Inc. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines; (b) Countrywide Home Loans, Inc. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines when no compensating factor was present; and (c) Countrywide Home Loans, Inc. was failing frequently, and increasingly frequently, to follow quality-assurance practices intended to detect and prevent fraud.

225.    By these untrue or misleading statements, Barclays Capital and BCAP materially understated the risk of the certificate issued by BCAP LLC Trust 2007-AA2 that they offered and sold to Seattle Bank.

**3.    Basis of the allegations above that these statements by Barclays Capital and BCAP about the underwriting guidelines of the originator of the mortgage loans in the collateral pool of this securitization, and about the extent of their compliance with those guidelines, were untrue or misleading**

226.    Seattle Bank repeats paragraph 77.

227.    Seattle Bank repeats paragraph 179.

**G.    Claim for Rescission**

228.    Under RCW 21.20.010 and 21.20.430(1), Seattle Bank is entitled to recover the consideration that it paid for this certificate, $100,000,000, plus interest of 8% per annum from March 29, 2007, to the date on which it recovers the $100,000,000, plus its

COMPLAINT FOR RESCISSION – Page 75

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1  costs and the reasonable fees of its attorneys in this action, minus the amount of income it

2  has received on the certificate. Pursuant to RCW 21.20.430(6), Seattle Bank will tender the

3  certificate before entry of judgment.

4

5  ////
   ////
6  ////
   ////
7  ////
   ////
8  ////
   ////
9  ////
   ////
10 ////
   ////
11 ////
   ////
12 ////
   ////
13 ////
   ////
14 ////
   ////
15 ////
   ////
16 ////
   ////
17 ////
   ////
18 ////
   ////
19 ////
   ////
20 ////
   ////
21 ////
   ////
22 ////
   ////
23 ////
   ////
24 ////
   ////
25 ////
   ////
26 ////

COMPLAINT FOR RESCISSION – Page 76

## IX. PRAYER FOR RELIEF

WHEREFORE, Seattle Bank respectfully demands payment of the amount it paid to purchase each certificate, together with interest on that amount at the rate of 8% per annum from the date on which Seattle Bank purchased each certificate until the date on which it receives payment, and its costs and attorneys' fees in this action, all as provided by RCW 21.20.430(1).

## JURY DEMAND

SEATTLE BANK DEMANDS TRIAL BY SIX PERSON JURY OF ALL ISSUES SO TRIABLE.

Dated: December 23, 2009

YARMUTH WILSDON CALFO PLLC

By: _____
        Richard C. Yarmuth, WSBA #4990
        Matthew Carvalho, WSBA #31201

818 Stewart Street
Seattle, Washington 98101
(206) 516-3800
(206) 516-3888 (fax)

GRAIS & ELLSWORTH LLP
70 East 55th Street
New York, New York 10022
(212) 755-0100
(212) 755-0052 (fax)

COMPLAINT FOR RESCISSION – Page 77

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

600.01 jl230601 12/23/09

SUPERIOR COURT OF WASHINGTON
COUNTY OF KING

Federal Home Loan Bank of Seattle

VS

Barclays Capital, Inc., et al.

NO. 09-2-46320-4 SEA

CASE INFORMATION COVER SHEET
AND AREA DESIGNATION

## CAUSE OF ACTION

**(COL) -**    CONTRACT/COMMERCIAL

## AREA DESIGNATION

**SEATTLE -**    Defined as all King County north of Interstate 90 and including all
of Interstate 90 right of way, all of the cities of Seattle, Mercer
Island, Issaquah, and North Bend, and all of Vashon and Maury
Islands.

### IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
### IN AND FOR THE COUNTY OF KING

| | |
|---|---|
| Federal Home Loan Bank of Seattle | NO. 09-2-46320-4 SEA |
| | Order Setting Civil Case Schedule (*ORSCS) |
| **vs** Plaintiff(s) | |
| Barclays Capital, Inc., et al. | ASSIGNED JUDGE Kessler 44 |
| | FILE DATE: 12/23/2009 |
| Defendant(s) | TRIAL DATE: 06/13/2011 |

A civil case has been filed in the King County Superior Court and will be managed by the Case Schedule on Page 3 as ordered by the King County Superior Court Presiding Judge.

### I. NOTICES

**NOTICE TO PLAINTIFF:** The Plaintiff may serve a copy of this **Order Setting Case Schedule** (*Schedule*) on the Defendant(s) along with the *Summons and Complaint/Petition*. Otherwise, the Plaintiff shall serve the *Schedule* on the Defendant(s) within 10 days after the later of: (1) the filing of the *Summons and Complaint/Petition* or (2) service of the Defendant's first response to the *Complaint/Petition*, whether that response is a *Notice of Appearance*, a response, or a Civil Rule 12 (CR 12) motion. The *Schedule* may be served by regular mail, with proof of mailing to be filed promptly in the form required by Civil Rule 5 (CR 5).

*"I understand that I am required to give a copy of these documents to all parties in this case."*

Matthew Carvalho

Print Name

MACarr

Sign Name

Order Setting Civil Case Schedule (*ORSCS)

REV. 12/08    1

## I. NOTICES (continued)

**NOTICE TO ALL PARTIES:**
All attorneys and parties should make themselves familiar with the King County Local Rules [*KCLR*] – especially those referred to in this *Schedule*. In order to comply with the *Schedule*, it will be necessary for attorneys and parties to pursue their cases vigorously from the day the case is filed. For example, discovery must be undertaken promptly in order to comply with the deadlines for joining additional parties, claims, and defenses, for disclosing possible witnesses [*See KCLCR 26*], and for meeting the discovery cutoff date [*See KCLCR 37(g)*].

**CROSSCLAIMS, COUNTERCLAIMS AND THIRD PARTY COMPLAINTS:**
A filing fee of **$200** must be paid when any answer that includes additional claims is filed in an existing case.

**KCLCR 4.2(a)(2)**
A Confirmation of Joinder, Claims and Defenses or a Statement of Arbitrability must be filed by the deadline in the schedule. The court will review the confirmation of joinder document to determine if a hearing is required. If a Show Cause order is issued, all parties cited in the order must appear before their Chief Civil Judge.

**PENDING DUE DATES CANCELED BY FILING PAPERS THAT RESOLVE THE CASE:**
When a final decree, judgment, or order of dismissal of <u>all parties and claims</u> is filed with the Superior Court Clerk's Office, and a courtesy copy delivered to the assigned judge, all pending due dates in this *Schedule* are automatically canceled, including the scheduled Trial Date. It is the responsibility of the parties to 1) file such dispositive documents within 45 days of the resolution of the case, and 2) strike any pending motions by notifying the bailiff to the assigned judge.

Parties may also authorize the Superior Court to strike all pending due dates and the Trial Date by filing a *Notice of Settlement* pursuant to KCLCR 41, and forwarding a courtesy copy to the assigned judge. If a final decree, judgment or order of dismissal of <u>all parties and claims</u> is not filed by 45 days after a *Notice of Settlement*, the case may be dismissed with notice.

If you miss your scheduled Trial Date, the Superior Court Clerk is authorized by KCLCR 41(b)(2)(A) to present an *Order of Dismissal*, without notice, for failure to appear at the scheduled Trial Date.

**NOTICES OF APPEARANCE OR WITHDRAWAL AND ADDRESS CHANGES:**
*All parties to this action must keep the court informed of their addresses.* When a Notice of Appearance/Withdrawal or Notice of Change of Address is filed with the Superior Court Clerk's Office, parties must provide the assigned judge with a courtesy copy.

**ARBITRATION FILING <u>AND</u> TRIAL DE NOVO POST ARBITRATION FEE:**
A Statement of Arbitrability must be filed by the deadline on the schedule **if the case is subject to mandatory arbitration** and service of the original complaint and all answers to claims, counterclaims and cross-claims have been filed. If mandatory arbitration is required after the deadline, parties must obtain an order from the assigned judge transferring the case to arbitration. **Any party filing a Statement must pay a $220 arbitration fee.** If a party seeks a trial de novo when an arbitration award is appealed, a fee of $250 and the request for trial de novo must be filed with the Clerk's Office Cashiers.

**NOTICE OF NON-COMPLIANCE FEES:**
All parties will be assessed a fee authorized by King County Code 4.71.050 whenever the Superior Court Clerk must send notice of non-compliance of schedule requirements <u>and/or</u> Local Civil Rule 41.

**King County Local Rules are available for viewing at www.kingcounty.gov/courts/clerk.**

## II. CASE SCHEDULE

| CASE EVENT | DEADLINE or EVENT DATE | Filing Needed |
|---|---|---|
| Case Filed and Schedule Issued. | Wed 12/23/2009 | ★ |
| Last Day for Filing Statement of Arbitrability without a Showing of Good Cause for Late Filing [*See KCLMAR 2.1(a) and Notices on Page 2*]. **$220 arbitration fee must be paid** | Wed 06/02/2010 | ★ |
| **DEADLINE** to file Confirmation of Joinder if not subject to Arbitration. [*See KCLCR 4.2(a) and Notices on Page 2*]. | Wed 06/02/2010 | ★ |
| **DEADLINE** for Hearing Motions to Change Case Assignment Area. [*See KCLCR 82(e)*] | Wed 06/16/2010 | |
| **DEADLINE** for Disclosure of Possible Primary Witnesses [*See KCLCR 26(b)*]. | Mon 01/10/2011 | |
| **DEADLINE** for Disclosure of Possible Additional Witnesses [*See KCLCR 26(b)*]. | Tue 02/22/2011 | |
| **DEADLINE** for Jury Demand [*See KCLCR 38(b)(2)*]. | Mon 03/07/2011 | ★ |
| **DEADLINE** for Setting Motion for a Change in Trial Date [*See KCLCR 40(d)(2)*]. | Mon 03/07/2011 | ★ |
| **DEADLINE** for Discovery Cutoff [*See KCLCR 37(g)*]. | Mon 04/25/2011 | |
| **DEADLINE** for Engaging in Alternative Dispute Resolution [*See KCLCR 16(b)*]. | Mon 05/16/2011 | |
| **DEADLINE** for Exchange Witness & Exhibit Lists & Documentary Exhibits [*See KCLCR 4(j)*]. | Mon 05/23/2011 | |
| **DEADLINE** to file Joint Confirmation of Trial Readiness [*See KCLCR 16(a)(2)*] | Mon 05/23/2011 | ★ |
| **DEADLINE** for Hearing Dispositive Pretrial Motions [*See KCLCR 56; CR 56*]. | Tue 05/31/2011 | |
| Joint Statement of Evidence [*See KCLCR (4)(k)*]. | Mon 06/06/2011 | ★ |
| **DEADLINE** for filing Trial Briefs, Proposed Findings of Fact and Conclusions of Law and Jury Instructions (Do not file Proposed Findings of Fact and Conclusions of Law with the Clerk) | Mon 06/06/2011 | ★ |
| Trial Date [*See KCLCR 40*]. | Mon 06/13/2011 | |

### III. ORDER

Pursuant to King County Local Civil Rule 4 [*KCLCR 4*], IT IS ORDERED that the parties shall comply with the schedule listed above. Penalties, including but not limited to sanctions set forth in Local Civil Rule 4(g) and Rule 37 of the Superior Court Civil Rules, may be imposed for non-compliance. It is FURTHER ORDERED that the party filing this action **must** serve this *Order Setting Civil Case Schedule* and attachment on all other parties.

DATED: __12/23/2009__

_____
**PRESIDING JUDGE**

Order Setting Civil Case Schedule (*ORSCS)

### IV. ORDER ON CIVIL PROCEEDINGS FOR ASSIGNMENT TO JUDGE

**READ THIS ORDER BEFORE CONTACTING YOUR ASSIGNED JUDGE**
This case is assigned to the Superior Court Judge whose name appears in the caption of this case
schedule. The assigned Superior Court Judge will preside over and manage this case for all pretrial
matters.

**COMPLEX LITIGATION:** If you anticipate an unusually complex or lengthy trial, please notify the
assigned court as soon as possible.

**APPLICABLE RULES:** Except as specifically modified below, all the provisions of King County Local
Civil Rules 4 through 26 shall apply to the processing of civil cases before Superior Court Judges. The
local civil rules can be found at http://www.kingcounty.gov/courts/superiorcourt/civil.aspx .

**CASE SCHEDULE AND REQUIREMENTS**
Deadlines are set by the case schedule, issued pursuant to Local Civil Rule 4.

**THE PARTIES ARE RESPONSIBLE FOR KNOWING AND COMPLYING WITH ALL DEADLINES
IMPOSED BY THE COURT'S LOCAL CIVIL RULES.**

**A. Joint Confirmation regarding Trial Readiness Report:**
No later than twenty one (21) days before the trial date, parties shall complete and file (with a copy to the
assigned judge) a joint confirmation report setting forth whether a jury demand has been filed, the
expected duration of the trial, whether a settlement conference has been held, and special problems and
needs (e.g. interpreters, equipment, etc.).

The form is available at http://www.kingcounty.gov/courts/superiorcourt.aspx . If parties wish to request
a CR 16 conference, they must contact the assigned court. Plaintiff's/petitioner's counsel is responsible
for contacting the other parties regarding said report.

**B. Settlement/Mediation/ADR**
a. Forty five (45) days before the trial date, counsel for plaintiff/petitioner shall submit a written settlement
demand.. Ten (10) days after receiving plaintiff's/petitioner's written demand, counsel for
defendant/respondent shall respond (with a counter offer, if appropriate). .

b. Twenty eight (28) days before the trial date, a Settlement/Mediation/ADR conference shall have been
held. FAILURE TO COMPLY WITH THIS SETTLEMENT CONFERENCE REQUIREMENT MAY
RESULT IN SANCTIONS.

**C. Trial:** Trial is scheduled for 9:00 a.m. on the date on the case schedule or as soon thereafter as
convened by the court. The Friday before trial, the parties should access the King County Superior Cour
website http://www.kingcounty.gov/courts/superiorcourt.aspx to confirm trial judge assignment.
Information can also be obtained by calling (206) 205-5984.

### MOTIONS PROCEDURES

**A. Noting of Motions**

**Dispositive Motions:** All summary judgment or other dispositive motions will be heard with oral
argument before the assigned judge. The moving party must arrange with the hearing judge a date and
time for the hearing, consistent with the court rules. Local Civil Rule 7 and Local Civil Rule 56 govern
procedures for summary judgment or other motions that dispose of the case in whole or in part. The
local civil rules can be found at http://www.kingcounty.gov/courts/superiorcourt/civil.aspx.

**Nondispositive Motions:** These motions, which include discovery motions, will be ruled on by the assigned judge without oral argument, unless otherwise ordered. All such motions must be noted for a date by which the ruling is requested; this date must likewise conform to the applicable notice requirements. Rather than noting a time of day, the Note for Motion should state "Without Oral Argument." Local Civil Rule 7 governs these motions, which include discovery motions. The local civil rules can be found at http://www.kingcounty.gov/courts/superiorcourt/civil.aspx.

**Motions in Family Law Cases not involving children:** Discovery motions to compel, motions in limine, motions relating to trial dates and motions to vacate judgments/dismissals shall be brought before the assigned judge. All other motions should be noted and heard on the Family Law Motions calendar. Local Civil Rule 7 and King County Family Law Local Rules govern these procedures. The local rules can be found at http://www.kingcounty.gov/courts/superiorcourt/civil.aspx.

**Emergency Motions:** Under the court's local civil rules, emergency motions will be allowed only upon entry of an Order Shortening Time. However, emergency discovery disputes may be addressed by telephone call and without written motion, if the judge approves.

## B. Original Documents/Working Copies/ Filing of Documents

**All original documents must be filed with the Clerk's Office.** Please see information on the Clerk's Office website at www.kingcounty.gov/courts/clerk regarding the new requirement outlined in LGR 30 that attorneys must e-file documents in King County Superior Court. The exceptions to the e-filing requirement are also available on the Clerk's Office website.

The working copies of all documents in support or opposition must be marked on the upper right corner of the first page with the date of consideration or hearing and the name of the assigned judge. The assigned judge's working copies must be delivered to his/her courtroom or the Judges' mailroom. Working copies of motions to be heard on the Family Law Motions Calendar should be filed with the Family Law Motions Coordinator. On June 1, 2009 you will be able to submit working copies through the Clerk's office E-Filing application at www.kingcounty.gov/courts/clerk.

**Service of documents.** E-filed documents may be electronically served on parties who opt in to E-Service within the E-Filing application. The filer must still serve any others who are entitled to service but who have not opted in. E-Service generates a record of service document that can be e-filed. Please see information on the Clerk's office website at www.kingcounty.gov/courts/clerk regarding E-Service.

**Original Proposed Order:** Each of the parties must include an original proposed order granting requested relief with the working copy materials submitted on any motion. Do not file the original of the proposed order with the Clerk of the Court. Should any party desire a copy of the order as signed and filed by the judge, a pre-addressed, stamped envelope shall accompany the proposed order.

**Presentation of Orders:** All orders, agreed or otherwise, must be presented to the assigned judge. If that judge is absent, contact the assigned court for further instructions. If another judge enters an order on the case, counsel is responsible for providing the assigned judge with a copy.

Proposed orders finalizing settlement and/or dismissal by agreement of all parties shall be presented to the assigned judge or in the Ex Parte Department. Formal proof in Family Law cases must be scheduled before the assigned judge by contacting the bailiff, or formal proof may be entered in the Ex Parte Department. If final order and/or formal proof are entered in the Ex Parte Department, counsel is responsible for providing the assigned judge with a copy.

**C.    Form**

Memoranda/briefs for matters heard by the assigned judge may not exceed twenty four (24) pages for dispositive motions and twelve (12) pages for nondispositive motions, unless the assigned judge permits over-length memoranda/briefs in advance of filing. Over-length memoranda/briefs and motions supported by such memoranda/briefs may be stricken.

*IT IS SO ORDERED. FAILURE TO COMPLY WITH THE PROVISIONS OF THIS ORDER MAY RESULT IN DISMISSAL OR OTHER SANCTIONS. PLAINTIFF/PEITITONER SHALL FORWARD A COPY OF THIS ORDER AS SOON AS PRACTICABLE TO ANY PARTY WHO HAS NOT RECEIVED THIS ORDER.*

_____

**PRESIDING JUDGE**

King County
Department of Judicial Administration
Superior Court Clerk's Office

## IMPORTANT NOTICE

### KING COUNTY SUPERIOR COURT HEARING LOCATIONS WILL CHANGE

### IF THE MALENG REGIONAL JUSTICE CENTER IN KENT IS EVACUATED

Potential serious flooding of the Green River Valley is a possibility this year based on issues with the Howard Hanson Dam.  The US Army Corps of Engineers is making the necessary repairs to the dam; however until the work is completed, the Maleng Regional Justice Center in Kent will be on an evacuation alert status.

The Clerk's Office and Superior Court remains committed to providing good customer service throughout the flood evacuation period.  If it becomes necessary to evacuate the Maleng Regional Justice Center and relocate the courtrooms, location changes to scheduled court proceedings at the King County Courthouse in Seattle may also occur.

**If you have a court proceeding scheduled either at the King County Courthouse in Seattle or at the Maleng Regional Justice Center in Kent, please call (206) 296-9300 to find out if there is a change to the location of your court proceeding.  Call within 2 days of your scheduled court date for the latest information.**

Updated information will also be posted here:

King County Superior Court's website:  http://www.kingcounty.gov/courts/superiorcourt

King County Clerk's Office website: http://www.kingcounty.gov/courts/Clerk

We thank you for your patience during this time.

96